1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6
7

8  SIONE LUI,

9                              Petitioner,          Case No. C18-0893-TSZ-MAT

10       v.

11  MIKE OBENLAND,                                   REPORT AND RECOMMENDATION

12                              Respondent.

13

14                          <u>INTRODUCTION</u>

15       Petitioner Sione Lui proceeds with counsel in this habeas corpus matter pursuant to 28

16  U.S.C. § 2254.  In 2008, a King County Superior Court jury convicted petitioner of murder in the

17  second degree.  (Dkt. 9, Ex. 1.)  He received a sentence of 200 months confinement.  (*Id.*)

18       Petitioner raises eleven grounds for relief in his habeas petition.  (Dkt. 1.)  Respondent

19  submitted an answer, along with relevant portions of the state court record.  (Dkts. 8, 9 & 13.)

20  Now, having considered the petition, the answer and record, and the traverse and reply (Dkts. 14

21  & 16), the Court recommends the habeas petition be DENIED and this case DISMISSED.

22                          <u>BACKGROUND</u>

23       The Washington Supreme Court summarized the facts underlying petitioner's conviction

REPORT AND RECOMMENDATION - 1

as follows:

Lui and [Elaina] Boussiacos had a turbulent relationship, marked by mistrust and infidelity. Although they were engaged and living together by the summer of 2000, Boussiacos was uncertain about their marriage plans, and she alternated between wearing and not wearing her engagement ring. Boussiacos eventually discovered proof of an affair Lui was having with a married woman, and together the two women trapped him in a lie. Lui was aware that his relationship with Boussiacos was in trouble. He feared that Boussiacos would not return from a trip in mid-2000 and called a friend distraught and crying at the prospect of losing her.

Boussiacos told her mother that she no longer planned to marry Lui, and in early 2001, Boussiacos made plans to fly to her mother's home in California. On Friday, February 2, 2001, the night before her flight, Boussiacos dropped off her son from a previous marriage with the boy's father. Lui told police that Boussiacos returned to the couple's home at roughly 10:00 p.m., and the couple watched television. According to Lui's account, Boussiacos packed for the trip, changed into her nightgown, and went to bed.

Boussiacos never arrived in California. Her mother contacted Lui to report her missing the following Monday. On Friday, police found her car in the parking lot of a health club the couple frequented, located near their home. The police discovered Boussiacos's body in the trunk. The owner of the health club testified that she first noticed the car parked in the lot Saturday morning, February 3, and that it did not move all week. Police arranged for a bloodhound track shortly after discovering Boussiacos's body. After smelling a sample of Lui's clothes, the dog followed a scent trail from the lot where the body was found directly to Lui's front porch.

Boussiacos's friends and family agreed that she paid close attention to her personal appearance, taking great care with her dress and makeup when she went out. Her ex-husband testified that she routinely spent two hours on makeup, hair, and clothes before leaving the house. But when found, she had little makeup on, and she was dressed in black sweatpants, torn underwear, and a white T-shirt. Investigators noted that she was wearing tennis shoes, but the laces were tied oddly, on the far sides of each shoe, suggesting that her killer had dressed her after death. In addition, Boussiacos's luggage was packed in an unusual manner, containing several empty containers of hair product and makeup, two hair dryers, and a bottle of nail polish remover without any nail polish.

REPORT AND RECOMMENDATION - 2

> In 2007, detectives reviewing cold cases contacted and interviewed Lui. The State subsequently charged Lui with second degree murder in the death of Boussiacos. . . .

(Dkt. 9, Ex. 2 at 2-4.)

On appeal, the Washington Court of Appeals affirmed the conviction. (*Id.*, Exs. 3-8.) Petitioner sought review by the Washington Supreme Court, asserting a violation of the Sixth Amendment's Confrontation Clause through expert witness testimony based on the work of others who did not testify. (*Id.*, Ex. 9.) The court granted review, took supplemental briefing, and stayed consideration of the matter until the United States Supreme Court decided *Williams v. Illinois*, 567 U.S. 50 (2012). The court thereafter concluded the expert testimony in petitioner's trial did not violate the right to confrontation and affirmed the conviction. (*Id.*, Ex. 2.) It subsequently denied a motion for reconsideration and, on March 17, 2014, issued the mandate. (*Id.*, Exs. 21-23.)

Petitioner filed a personal restraint petition in the Washington Supreme Court while his direct appeal remained pending. (*Id.*, Exs. 24-25.) The court stayed the petition and, after affirming the conviction on direct appeal, transferred the petition to the Washington Court of Appeals. (*Id.*, Exs. 28-29.) The Court of Appeals denied the petition. (*Id.*, Ex. 34.)

Petitioner sought review by the Washington Supreme Court, presenting the following issues for consideration:

> 1. Was Lui denied effective assistance of counsel when his lawyer made multiple, prejudicial errors?
>
> 2. Did the State commit misconduct when the prosecutor argued without evidence that Lui committed a sexual assault; two detectives opined that Lui was lying; and the detective and prosecutor maintained that Lui showed his guilt by failing to act like an aggrieved fiancé?
>
> 3. Did the State violate its obligation to produce impeachment information regarding Detective Gulla?

REPORT AND RECOMMENDATION - 3

4.      Did a juror inject extrinsic evidence into the deliberations when she told the other jurors that, based on her purported knowledge of the crime scene, a key defense witness's testimony was faulty?

5.      Is Lui entitled to a new trial based on newly discovered evidence when DNA has linked a specific violent felon to blood found in the victim's car at the time of the murder?

(*Id.*, Ex. 35 at 1-2.)  The Washington Supreme Court found no error and affirmed.  (*Id.*, Exs. 36 & 39.)  On July 19, 2017, the state court issued a certificate of finality.  (*Id.*, Ex. 40.)

<u>DISCUSSION</u>

Petitioner raises the following grounds for relief in this habeas proceeding:

1.      The introduction of testimonial hearsay through a surrogate witness violated Mr. Lui's federal Confrontation Clause right.

2.      Mr. Lui was denied his Sixth and Fourteenth Amendment guarantee to effective assistance of counsel by counsel's failure to competently investigate and present testimony rebutting the State's dog track evidence.

3.      Mr. Lui was denied his Sixth and Fourteenth Amendment right to effective counsel because counsel slept and was functionally absent from significant portions of trial.

4.      Mr. Lui was denied his Sixth and Fourteenth Amendment right to effective counsel when counsel failed to object to testimony by a police officer that Lui was lying during interrogation.

5.      Mr. Lui was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel when counsel failed to object to multiple instances of flagrant and harmful misconduct by the prosecutor during closing argument.

6.      Mr. Lui was denied his federal constitutional right to Due Process by multiple instances of prosecutorial misconduct in closing argument.

7.      Mr. Lui was denied his Sixth and Fourteenth Amendment guarantees to effective assistance of counsel when counsel failed to investigate and present testimony regarding Lui's arm injury.

REPORT AND RECOMMENDATION - 4

8.    Mr. Lui was denied his right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendment when counsel failed to investigate "other suspect" evidence.

9.    Mr. Lui was denied Due Process due to jury misconduct

10.    Mr. Lui was denied his guaranteed right to effective assistance of counsel when counsel failed to impeach a detective with his lengthy disciplinary history.

11.    The cumulative prejudice from the multiple errors merits a new trial.

(Dkt. 1 at 8-45.)  As conceded by respondent, petitioner properly exhausted his available state court remedies.  The Court, as such, proceeds to consideration of the merits.

A.    <u>Habeas Standard</u>

Federal habeas corpus relief is available only to a person "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.  § 2254(d)(1).  A petition may also be granted if the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  § 2254(d)(2).

Under the "contrary to" clause of § 2254(d)(1), a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).   Under the "unreasonable application" clause, a federal court may grant the writ only if the state court

REPORT AND RECOMMENDATION - 5

identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 412-13.

A state court's decision may be overturned only if the application of Supreme Court holdings is "'objectively unreasonable,'" not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*; *accord White*, 572 U.S. at 419.

In considering whether a state court decision was contrary to or an unreasonable application of clearly established law or an unreasonable determination of the facts, this Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011). State court findings of fact are presumptively correct in federal habeas proceedings, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B.    Evidentiary Hearing

Pursuant to § 2254(e)(2), if the petitioner failed to develop the factual basis of a claim in state court, the federal court may not hold an evidentiary hearing on that claim unless two prerequisites exist. First, the claim must rely on either (a) a new rule of constitutional law made retroactive to cases on collateral review by the United States Supreme Court and previously unavailable, or (b) a factual predicate that could not have been previously discovered through the

exercise of due diligence.   § 2254(e)(2)(A)(i)-(ii).   Second, the facts underlying the claim must establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the petitioner guilty.   § 2254(e)(2)(B).

Failure to develop a claim's factual basis in state court is not established unless there is a lack of diligence or some greater fault attributable to the petitioner or his counsel.   *Williams v. Taylor*, 529 U.S. 420, 432, 437 (2000); *Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999). Diligence, at minimum, requires that petitioner sought an evidentiary hearing in state court pursuant to applicable procedures.   *Id*.   A habeas petitioner has not failed to develop the factual basis of a claim where he was denied an evidentiary hearing in state court.   *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997).

The mere fact an evidentiary hearing is not precluded by § 2254(e)(2) does not entitle a petitioner to such a hearing.   *Downs v. Hoyt*, 232 F.3d 1031, 1041 (9th Cir. 2000).   Instead, the court retains discretion to determine whether an evidentiary hearing is appropriate or required under the pre-AEDPA standard governing evidentiary hearings.   *Baja*, 187 F.3d at 1078.   *See also Downs*, 232 F.3d at 1041.   In deciding whether to grant an evidentiary hearing, the court must consider whether such a hearing could enable an applicant to prove factual allegations, which, if true, would entitle the applicant to federal habeas relief.   *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).   The court need not hold an evidentiary hearing where the petition raises solely questions of law or where the issues may be resolved based on the state court record.   *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998).   "It follows that, if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."   *Landrigan*, 550 U.S at 474.   *Accord Totten*, 137 F.3d at 1176 (evidentiary hearing "*not* required on issues that can be resolved by reference to the state court record.")

1    (emphasis in original).   "Because the deferential standards prescribed by § 2254 control whether

2    to grant habeas relief, a federal court must take into account those standards in deciding whether

3    an evidentiary hearing is appropriate." *Landrigan*, 550 U.S. at 473-75 (cited source omitted).

4    C.    Petitioner's Grounds for Relief

5          1.    Confrontation Clause Violation (Ground 1):

6          The Sixth Amendment's Confrontation Clause gives the accused "[i]n all criminal

7    prosecutions, . . . the right . . . to be confronted with the witnesses against him."  U.S. Const.

8    amend. VI.  In *Crawford v. Washington*, 541 U.S. 36, 59, 68-89 (2004), the Supreme Court held

9    testimonial statements of witnesses not present at trial may be admitted only where the declarant

10   is unavailable and the defendant had prior opportunity for cross-examination.  The core class of

11   testimonial statements include: (1) "'ex parte in-court testimony or its functional equivalent . . .

12   such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

13   examine, or similar pretrial statements that declarants would reasonably expect to be used

14   prosecutorially,'" (2) "'extrajudicial statements . . . contained in formalized testimonial materials,

15   such as affidavits, depositions, prior testimony, or confessions,'" and (3) "'statements that were

16   made under circumstances which would lead an objective witness reasonably to believe that the

17   statement would be available for use at a later trial[.]'" *Id.* at 51-52 (quoted sources omitted).

18   Testimonial "applies at a minimum to prior testimony at a preliminary hearing, before a grand

19   jury, or at a former trial; and to police interrogations." *Id.* at 68.

20         After *Crawford*, the Supreme Court set forth a "primary purpose" test for determining

21   whether a statement is testimonial.  *Ohio v. Clark*, ___ U.S. ___, 135 S. Ct. 2173, 2179, 192 L.

22   Ed. 2d 306 (2015) (citing *Davis v. Washington*, 547 U.S. 813 (2006)).  Statements are testimonial:

23   (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove

REPORT AND RECOMMENDATION - 8

1    past events potentially relevant to later criminal prosecution,'" and (2) "when written statements

2    are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or

3    proving some fact' at trial." *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (quoting *Davis*,

4    547 U.S. at 822, and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)).

5         Determination of the primary purpose requires an objective evaluation of circumstances.

6    *Michigan v. Bryant*, 562 U.S. 344, 359-60 (2011). "[T]he relevant inquiry is not the subjective or

7    actual purpose of the individuals involved in a particular encounter, but rather the purpose that

8    reasonable participants would have had, as ascertained from the individuals' statements and

9    actions and the circumstances in which the encounter occurred." *Id*. at 360. Ultimately, "the

10   question is whether, in light of all the circumstances, viewed objectively, the "primary purpose"

11   of the conversation was to "creat[e] an out-of-court substitute for trial testimony." *Clark*, 135 S.

12   Ct. at 2180. When answered affirmatively, a statement is testimonial hearsay and *Crawford*

13   applies. *Bryant*, 562 U.S. at 359-60. Otherwise, admissibility is governed by the rules of evidence,

14   not the Confrontation Clause. *Id*.

15        In *Crawford*, 541 U.S. 36, the Court found statements in response to a police interrogation

16   testimonial, and, in *Davis*, 547 U.S. 813, the Court found statements in a 911 call non-testimonial,

17   but statements in an affidavit to police testimonial. In *Melendez-Diaz*, 557 U.S. 305, and

18   *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court found testimonial, respectively, a crime

19   laboratory analyst's certificate of analysis and a forensic analyst's certification of a blood-alcohol

20   report. The Court found non-testimonial, in *Bryant*, 562 U.S. 344, statements made at the scene

21   of a shooting, and, in *Clark*, 135 S. Ct. 2173, a child's statements to a teacher about physical abuse.

22   Finally, in *Williams v. Illinois*, 567 U.S. 50, 51 (2012), the Court considered the "constitutionality

23   of allowing an expert witness to discuss others' testimonial statements if those statements are not

REPORT AND RECOMMENDATION - 9

themselves admitted as evidence." A plurality found no Confrontation Clause violation in those circumstances. *Id.* at 58. One justice concurred in the judgment and found the DNA laboratory reports at issue lacked sufficient formality or solemnity to be considered testimonial, and distinguishable from the formal certificates in *Melendez-Diaz* and *Bullcoming. Id.* at 110-18. However, as discussed further below, *Williams* did not yield a majority opinion and its fractured rulings left the question regarding expert testimony unresolved.

Petitioner here avers the introduction of testimonial hearsay at trial through a medical examiner and DNA expert violated his rights under the Confrontation Clause. The Washington Supreme Court described the claim as follows:

> . . . At trial, . . . , the State presented expert testimony from chief medical examiner Dr. Richard Harruff and DNA expert Gina Pineda. Harruff's testimony related to Boussiacos's autopsy. While Harruff personally reviews the reports for each of the 1,300 autopsies that his office processes each year, the actual autopsy had been performed by Associate Medical Examiner Dr. Kathy Raven. Harruff was not present for the autopsy, and while he believed that he saw the body after the procedure, he could not be sure. However, Harruff did not testify to Raven's conclusions; and the report was not introduced into evidence. Instead, he referred to photographs of the victim's injuries taken during the autopsy to testify that in his opinion, the cause of death was asphyxia by manual strangulation or strangulation with a ligature. Based solely on his experience with strangulation, he offered his opinion that it takes roughly four minutes to die in this manner. Harruff also testified to the position of Boussiacos's body and the odd manner in which she was dressed. While Harruff relied primarily on photographs for this testimony, he made several statements that were taken from the autopsy report.
>
> Harruff testified that the body's temperature at the scene was measured at 38.4 degrees Fahrenheit, and that the ambient temperature was 30.5 degrees Fahrenheit. He did not take these measurements himself. Rather, Raven took the temperature measurements and recorded them in personal notes that were not part of the autopsy report but were later obtained in discovery. Based upon these two temperature data points, Harruff testified to his opinion that although it was "extremely difficult" to fix an exact

time of death, death was possible at any time between the 2nd and 7th of February.  Report of Proceedings (RP) at 1354-56, 1398-99.

Harruff also testified to the conclusion of a toxicology report prepared by analyst Martin Hughes of the Washington State Toxicology Laboratory.  Harruff did not perform this test personally or supervise it, and he did not offer his professional opinion about the testing methodology.  Instead, he recited the report's conclusion that no drugs, alcohol, or nicotine were found in Boussiacos's system.

The Washington State Patrol Crime Laboratory sent DNA samples obtained from the crime scene to two outside DNA laboratories:  Orchid Cellmark and Reliagene Technologies, a company that Orchid had acquired.  [(For the sake of simplicity, we analyze Reliagene's tests and Orchid's tests together and refer only to Orchid in the following analysis.)]  The samples included cuttings from Boussiacos's shoelaces as well as a vaginal swab and a vaginal wash of Boussiacos's body.  Pineda, Orchid's associate director and technical leader, testified about her company's testing of these samples against DNA taken from Lui, Lui's son from a previous marriage, and Boussiacos's ex-husband.

Pineda did not personally participate in or observe the tests, noting that since assuming her director role, she had "stepped away from the lab," although she did use the electronic data produced during the testing process to create a DNA profile that reflected "[her] own interpretation and [her] own conclusions . . ."  12 RP at 1484, 1507.  She offered a document summarizing the test results, which the trial court admitted solely for illustrative purposes, ruling that Pineda could refer to it during her presentation but that it would not go back to the jury room.  State Ex. 136.  Pineda testified that based on the results of these tests, she could not eliminate Lui or Lui's son as a major donor of the male DNA found on the shoelaces.  Nor could Boussiacos's ex-husband be eliminated as a donor.  The lab's testing was unable to detect a male profile from the vaginal swab extract.  However, Lui or Lui's son could not be eliminated as a donor of the DNA found in the vaginal wash.

Lui objected to Harruff's and Pineda's testimony on hearsay and confrontation grounds.  The trial court rejected his hearsay argument because ER 703 allows experts to rely on hearsay in forming their opinions.  It concluded that there was no confrontation violation because Harruff and Pineda were available for cross-examination.

REPORT AND RECOMMENDATION - 11

1    (Dkt. 9, Ex. 2 at 4-6.)

2        The state court first described the Supreme Court decisions prior to *Williams*.  (*Id*. at 10-

3    18.)  For instance, in *Melendez-Diaz*, 557 U.S. at 310-11, a majority found certificates identifying

4    bags of powder as "cocaine" testimonial, in that they were functionally equivalent to affidavits and

5    created for the primary purpose of providing evidence at trial.  The sworn statements had been

6    admitted into evidence and were "functionally identical to live, in-court testimony, doing

7    'precisely what a witness does on direct examination.'"  *Id*. at 307, 310-11 (quoting *Davis*, 547

8    U.S. at 830).  Their admission did not allow for cross-examination and violated the Confrontation

9    Clause.  In a concurring opinion, Justice Thomas conditioned his support on the formal nature of

10   the affidavits.  *Id*. at 329-30.  Four justices dissented upon finding the laboratory analysts who

11   performed the testing were not "'witnesses against'" a defendant, as they did not bear "personal

12   knowledge of some aspect of the defendant's guilt."  *Id*. at 343-44 (Kennedy, J., dissenting).

13       In *Bullcoming*, 564 U.S. at 664-65, the Court found a blood alcohol level certificate

14   admitted into evidence testimonial in that it had an evidentiary purpose, created in aid of a police

15   investigation, and was formalized.  The Court found a Confrontation Clause violation where the

16   presenting witness had not participated in the test, could not speak to procedures or observations,

17   and merely functioned as a "surrogate," relaying the conclusions of another.  *Id*. at 659-64.  In a

18   concurring opinion, Justice Sotomayor emphasized the limited reach of *Bullcoming*, addressing a

19   certificate with the sole purpose of admission into evidence; a testifying witness who was not a

20   "supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific

21   test at issue"; the absence of an independent opinion from the witness about underlying testimonial

22   reports not admitted into evidence; and a document not limited to "only machine-generated

23   results."  *Id*. at 672-74.  The same four justices dissented, describing the report as "impartial" and

REPORT AND RECOMMENDATION - 12

"prepared by experienced technicians in laboratories that follow professional norms and scientific protocols." *Id*. at 681 (Kennedy, J., dissenting).

The state court thereafter discussed *Williams*:

> . . . In *Williams*, an expert testified that a DNA profile taken from a rape victim matched a DNA profile recovered from the defendant. *Id*. at 2230. The expert did not prepare the DNA profile; rather, she relied on a DNA profile prepared by an outside laboratory. *Id*. at 2229. No one from that laboratory was subject to cross-examination. *See id*. at 2227, 2230. Justice Alito wrote for the four-judge plurality, including Chief Justice Roberts and Justices Kennedy, and Breyer, offering "two independent reasons" for finding no violation of the confrontation clause. *Id*. at 2244. First, the expert's reliance on the previous steps in the DNA analysis was not offered to prove the truth of the matter asserted. *Id*. at 2228. As a "second, independent basis" for the decision, Justice Alito pointed out that the DNA profile was produced before the defendant was identified as a suspect and "the profile that Cellmark provided was not inherently inculpatory." *Id*.

> The four justices who had voted together in *Bullcoming* – Justices Scalia, Ginsberg, Sotomayor, and Kagan – again voted together in *Williams*. This time Justice Kagan wrote for the four justices. Justice Kagan saw nothing wrong with the expert witness's testimony that two DNA profiles matched each other, for this was "a straightforward application" of her expertise. *Id*. at 2270 (Kagan, J., dissenting). Rather, the Court split on the provenance of the victim's DNA profile, that is, whether the expert affirmed that one of the profiles she was comparing had actually come from the victim, without having participated in creating that profile. *Id*. at 2236. Justice Kagan opined that the expert's testimony required the jury to accept the validity of a DNA test that had not been scrutinized by cross-examination. *Id*. at 2268-69 (Kagan, J., dissenting).

> As in *Melendez-Diaz* and *Bullcoming*, Justice Thomas provided the decisive fifth vote, but in *Williams* he concluded that the DNA lab reports lacked sufficient formality or solemnity to be considered testimonial. *Id*. at 2260-61 (Thomas, J., concurring in judgment). And none of these three cases provide a single clear rule because Justice Thomas provided the fifth critical vote in all three cases based on his individual theory that evidence is testimonial only if it bears indicia of formality and solemnity.

The dissent accuses us of counting perspectives and camps rather than signatures. Dissent at 3. However, counting signatures ignores the fact that a majority of the Court has never agreed on a test for expert witnesses, making it very difficult for courts to effectively follow. Four justices joined an opinion holding that the confrontation clause does not apply to expert witnesses when expressing their own conclusions, four justices attached no importance to the fact that evidence came in through an expert witness, and one justice focused on the solemnity of the evidence relied upon by an expert witness. 132 S. Ct. at 2228 (plurality opinion), 2260 (Thomas J., concurring in judgment), 2269-70 (Kagan, J., dissenting). Even if we count signatures, our decision is consistent with the five justices in *Williams* who agree that experts may rely upon and disclose independent DNA laboratory results when testifying about their own conclusions without violating a defendant's confrontation rights. *Id*. at 2240 (plurality opinion), 2255 (Thomas, J., concurring in judgment). Our test respects the five justices in *Williams*, while recognizing that in some circumstances an expert witness's testimony may trigger the confrontation clause. Our opinion also does not disregard the results in *Melendez-Diaz* and *Bullcoming* because we address only statements made by expert witnesses and not formalized certificates that are the equivalent of affidavits.

In addition to there being no clear reasoning for expert witnesses, no ruling of the Court is directly on point here. In three important ways, this case brings us into unchartered constitutional territory. First, *Melendez-Diaz* did not reach back to encompass every factual predicate behind an expert witness's findings. The confrontation clause does not demand the live testimony of "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device . . . ." *Melendez-Diaz*, 557 U.S. at 311 n.1. In other words, while a break in the chain of custody might detract from the credibility of an expert analysis of some piece of evidence, this break in the chain does not violate the confrontation clause. *Id*. Second, *Bullcoming* expressly did not reach the confrontation clause status of raw data generated by an automated process without human input. Rather, the subject matter of the confrontation clause concerns those "past events and human actions not revealed in raw, machine-produced data . . . ." 131 S. Ct. at 2714 (emphasis added); *see also id*. at 2723 (Sotomayor, J., concurring) ("This is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph. . . . Thus we do not decide whether . . . a State could introduce raw data generated by a machine in conjunction with the testimony of an expert witness."). Finally,

REPORT AND RECOMMENDATION - 14

> *Williams* did not address how the confrontation clause applies to the "panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians." 132 S. Ct. at 2244-45 (Breyer, J., concurring). The same question *Williams* did not reach – the confrontation clause status of forensic reports, expert witnesses, and the technical data underlying their conclusions – is now squarely before us.

(*Id*. at 18-21.)

Given the absence of binding Supreme Court precedent creating a rule, the Washington Supreme Court crafted a test for determining whether a witness could be deemed a "witness against" the defendant, as identified in the plain language of the confrontation right. (*Id*. at 21.) "[T]he word 'witness' indicates the act of attesting to facts, while the word 'against' indicates that the facts attested to must be adversarial in nature." (*Id*.) The court explained its rule as follows:

> The act of imparting factual information to the court is the *sine qua non* of a witness. *Crawford* tells us that a "witness" is a person who "'bears testimony'" and that "testimony" is "'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 541 U.S. at 52 (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). This definition does not sweep in analysts whose only role is to operate a machine or add a reagent to a mixture.
>
> Justice Kagan pointed out in her dissent in *Williams* that cross-examining a witness could be valuable in order to reveal erroneous lab work. 132 S. Ct. at 2264-65 [. . .]. The live testimony of a subordinate analyst may be desirable, but the question is whether it is constitutionally *required* – and as the Court recognized in *Melendez-Diaz*, the *potential to introduce error* does not a "witness" make. In *Melendez-Diaz*, Justice Kennedy pointed out that many people might be involved in a single drug test and that each of those people had the "power to introduce error," and he asserted that requiring all or "even one of these individuals to testify threatens to disrupt if not end many prosecutions . . . ." 557 U.S. at 333 (Kennedy, J., dissenting). In response, Justice Scalia clarified that the confrontation clause does not demand the live testimony of "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device. . . ." *Id*. at 311 n.1. Although the prosecution is indeed obliged to establish the chain of custody, "*this does not mean that*

*everyone who laid hands on the evidence must be called.*"   *Id.* (emphasis added.)  Rather, gaps in the chain of custody go to the weight of the evidence and not the admissibility.  *Id.* (citing *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988)).

In other words, merely laying hands on evidence, DNA or otherwise, does not a "witness" make – something more is required.  In *Melendez-Diaz*, an analyst became a witness by preparing a statement affirming that a substance was cocaine.  *Id.* at 311.  In *Bullcoming*, an analyst became a witness by giving live testimony that the defendant's blood alcohol level was 0.21.  131 S. Ct. at 2713.  Our analysis here is no different:  we are interested in experts who make statements to the court, not people who "la[y] hands on the evidence. . . . "  *Melendez-Diaz*, 557 U.S. at 311 n.1.

Not everyone who makes some affirmation of fact to the tribunal will fall under the confrontation clause.  The word "against" implies some adversarial element – some capacity to inculpate the defendant.  As eight justices (six current) of the Court tells us, the central object of the confrontation clause is "interrogations solely directed at establishing the facts of a past crime, in order to *identify (or provide evidence to convict) the perpetrator*."  *Davis*, 547 U.S. at 826 (emphasis added).  The New York Court of Appeals has recognized the necessity for a testimonial statement to bear some inculpatory character; among other factors, New York looks to "'whether the report accuses the defendant by directly linking him or her to the crime.'"  *People v. Pealer*, 20 N.Y.3d 447, 454, 985 N.E.2d 903 (2013) (quoting *People v. Brown*, 13 N.Y.3d 332, 339-40, 918 N.E.2d 927 (2009)).

Reading the words "witness" and "against" together, in the context of Supreme Court hints and the reasoned practices of other jurisdictions, gives us a working rule.  If the declarant makes a factual statement to a tribunal, then he or she is a witness.  If the witness's statements help to identify or inculpate the defendant, then the witness is a "witness against" the defendant.

(*Id.* at 21-24 (footnotes omitted).)

Responding to the dissent, the state court clarified its holding reached only to expert witnesses and did not allow laboratory reports to be admitted into evidence and used against a defendant without effective cross-examination, or allow "a laboratory supervisor to parrot the

REPORT AND RECOMMENDATION - 16

conclusions of his or her subordinates." (*Id*. at 24.) "Instead, our test allows expert witnesses to rely upon technical data prepared by others when reaching their own conclusions without requiring each laboratory technician to take the witness stand. The test does nothing more." (*Id*.) The state court concluded the Supreme Court would reach the same result under the facts at issue:

> . . . The result in *Williams* was that a forensic specialist was permitted to rely upon an outside laboratory's DNA profile when testifying that it matched a sample of the defendant's blood without violating the defendant's confrontation rights. *See Williams*, 132 S. Ct. at 2228 (plurality opinion); 132 S. Ct. at 2255 (Thomas, J., concurring in judgment). Our opinion reaches the same result today: experts may rely upon DNA profiles created by other laboratory analysts when concluding there is a DNA match without violating the confrontation clause.

(*Id*. at 25.) The court distinguished *Crawford* as not addressing expert witnesses and *Melendez-Diaz* and *Bullcoming* as involving the admission of forensic analysis through affidavits or live testimony, explaining: "An expert witness may not parrot the conclusions of others and circumvent the confrontation clause, as is seen later in our analysis of the toxicology results. An expert may, however, rely on the work of laboratory technicians when reaching his or her conclusion." (*Id*. at 25-26.) The court agreed DNA or other scientific or technical evidence used against a defendant implicates the Confrontation Clause, while clarifying:

> Our test requires cross-examination, but only cross-examination of the witness who gives meaning to *raw* data. Not every laboratory analyst is required to testify. *See Williams*, 132 S. Ct. at 2228 (plurality). If DNA evidence is used in trial, someone must be subject to cross-examination. The "someone" required by the confrontation clause is the person who has made the final comparison that is used against the defendant.

(*Id*. at 26-27.) The court further distinguished *Melendez-Diaz* and *Bullcoming*, observing: "The Supreme Court has never clearly set forth the confrontation clause requirements for when an expert witness relies on the work of others to arrive at his or her own conclusion." (*Id*. at 27-28 (noting

REPORT AND RECOMMENDATION - 17

the "little doubt" the documents in *Melendez-Diaz* fell within the "'core class of testimonial statements'" identified in *Crawford* and that *Melendez-Diaz* "did not extend beyond the equivalent of affidavits or other formalized testimony."))

The Washington Supreme Court concluded:

> Nothing in prior Supreme Court decisions precludes our test. Applying the test shows that Orchid's DNA analysts were not witnesses against the defendant, but rather facilitated Pineda's role as an expert witness. Similarly, taking the temperature of Pineda's body was not an inculpatory act; it helped the expert estimate the time of death. Finally, while the toxicology report and Harruff's statements taken from the autopsy report helped to inculpate Lui, their admission was harmless error.

(*Id.* at 28.) The court further explained these conclusions as set forth below.

a.    <u>DNA testing and temperature readings</u>:

The state court concluded "the DNA testing process does not become inculpatory and invoke the confrontation clause until the final step, where a human analyst must use his or her expertise to interpret the machine readings and create a profile." (*Id.*) Because Pineda used her expertise to create a factual profile incriminating Lui, she was the appropriate witness to introduce the DNA evidence. (*Id.*) In reaching this conclusion, the court outlined the five steps in the DNA testing, including (1) taking a sample from the evidence; (2) using chemicals to break down the sample and release DNA molecules; (3) measuring the amount of DNA recovered in the second step and replicating the DNA through a process called polymerase chain reaction, "'chemically photocopying the 13 different areas of DNA'"; (4) processing the DNA by a capillary electrophoresis instrument, using a light beam to capture fluorescent markings on the DNA and identify peaks and repeats in the DNA makeup; and (5) the machine outputs an electropherogram, or a plot of the peaks and valleys in the DNA. (*Id.* at 28-30.) The court explained that, unlike the

REPORT AND RECOMMENDATION - 18

first four steps:

> *Only* [at the final step] does *any* element of human decision-making
> enter the process; an expert must translate the peaks and valleys of
> the electropherogram into a DNA profile. The expert can then
> prepare an allele table that compares the DNA profiles taken from
> various sources. *See* State Ex. 136, at 4. Unlike previous steps in
> the process, the DNA profile is an affirmation of fact; it is a
> conclusory statement that a given DNA donor has certain genetic
> characteristics. But this does not necessarily make the DNA profile
> into a confrontation clause matter, for two reasons. First, the DNA
> profile was not introduced into evidence, but only shown during
> Pineda's testimony for illustrative purposes. It is hard to imagine
> that a chart that never enters into evidence is meant as "an out-of-
> court substitute for trial testimony." *Bryant*, 113 S. Ct. at 1155. And
> the second component of the confrontation clause must still be
> satisfied – the statement must still be "against" someone.

(*Id*. at 30 (emphasis in original).)

Applying its Confrontation Clause test, the court held:

> The necessary inculpatory element enters the equation once
> an expert compares the DNA profiles. Done on the stand in open
> court, this comparison is permissible as a "straightforward
> application of the [analyst]'s expertise." *Williams*, 132 S. Ct. at
> 2270 (Kagan, J., dissenting). The confrontation clause is implicated
> only at the comparison stage because an allele table does not itself
> identify (let alone inculpate) anyone, nor would it have any
> particular meaning to a nonexpert. As the State described the allele
> table, it appears as "a whole bunch of numbers that kind of look like
> gobbledygook." 12 RP at 1538. Pineda's expertise was necessary
> to explain what the numbers represented (the number of times each
> of 16 specified gene sequences repeated) and why they were
> significant (the DNA of James Anthony Negron, an alternate
> suspect, failed to match DNA recovered from the crime scene.) In
> other words, the allele table lacked the inculpatory character of the
> certificate reading "Cocaine" in *Menendez-Diaz*, the blood alcohol
> concentration report in *Bullcoming*, or the witness statements in
> *Crawford* and *Davis*. The DNA profiles gained their inculpatory
> character, thus precipitating the confrontation clause issue, only
> when Pineda's testimony inculpated Lui.
>
> Accordingly, the only "witness against" the defendant in the
> course of the DNA testing process is the final analyst who examines
> the machine-generated data, creates a DNA profile, and makes a

determination that the defendant's profile matches some other profile. Absent that expert analysis, we are left with an abstract graph or set of numbers that has no bearing on the trial. Pineda was not a surrogate witness whose only purpose was to act as a channel for the DNA profile to enter into evidence. If she was, then the prosecution would hardly be served, or the defendant identified, by a page of meaningless "gobbledygook." 12 RP at 1538. Rather, Pineda examined the electropherogram and made the determination that Lui could not be excluded as a possible DNA donor.[] Pineda produced her own analysis, "an original product that can be tested through cross-examination." *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009).

The dissent argues that the jury saw reports prepared by other case analysts, who were never subject to cross-examination. Dissent at 17. It relies on Pineda's testimony that Hunan Nasir interpreted the results of samples and wrote the reports. 12 RP at 1552. The dissent ignores Pineda's testimony that she prepared the exhibit to use with her testimony. *Id*. at 1497-98; *see* State Ex. 136 (admitted for illustrative purposes only and did not go to the jury room). Pineda also testified that she came to her own results. 12 RP at 1507. She did not simply rely on the conclusions made by Nasir. *Id*. She looked at the electronic data from the samples, drew her own interpretations, and reached her own conclusion. *Id*. Nothing in the record states that the jury saw the reports prepared by Nasir. In fact, the exact opposite is true: Pineda testified that she prepared the exhibit. *Id*. at 1497-98.

In looking to the ultimate expert analysis, and not the lab work that leads into that analysis, we follow the Court in distinguishing between a person who attests to some fact and a person who *aids* an expert witness in reaching an attestation of fact: *Melendez-Diaz* stressed that live testimony is not required if it merely helps to establish "the chain of custody, authenticity of the sample, or accuracy of the testing device." 557 U.S. at 311 n.1. This category of evidence encompasses taking the clippings, adding the chemicals, and running the machines. It was Pineda who took the results from the capillary electrophoresis machine and reached a conclusion of fact from them (thus becoming a witness) and who testified that the conclusion of fact weighed on an issue in Lui's case (thus becoming a witness against Lui).

While Pineda did not personally observe the lab tests that underlaid her analysis – that is, the first four steps of the DNA testing process – *Bullcoming* guarantees the accused the right "to be confronted with the analyst who made the certification," 131 S. Ct.

at 2710, and *not* the analysts whose work might have contributed to that certification. Even if *Bullcoming* required the testifying witness to have personal knowledge of the forensic testing, Pineda had such knowledge. Pineda cannot be analogized to the surrogate analyst in *Bullcoming*, or even to the expert in *Williams*, who did not work for Cellmark, had no knowledge of Cellmark's operations, and "for all the record discloses, . . . may never have set foot in Cellmark's laboratory." 132 S. Ct. at 2268 (Kagan, J., dissenting). Rather, Pineda was an experienced supervisor with Orchid and was well informed about the procedures used and observations made. She reviewed the results of the control samples, she reviewed the testing procedures, and she reviewed her subordinate analysts' results at each step in the process. She was "a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Bullcoming*, 131 S. Ct. at 2722 (Sotomayor, J., concurring).

The problem in *Melendez-Diaz* and *Bullcoming* was that the defendant was denied effective cross-examination—in *Melendez-Diaz* because the witness was absent, 557 U.S. at 308, and in *Bullcoming* because the witness lacked the relevant knowledge, 131 S. Ct. at 2707. But here, Lui had the opportunity to cross-examine Pineda on how she arrived at her interpretation and conclusion from the electropherogram. He did not do so, instead focusing his cross-examination on the imprecision inherent to the procedure Orchid used: Y-STR testing focuses on the Y chromosome, which is the same in every person in the same paternal lineage, meaning that a DNA match for Lui is also a DNA match for Lui's son, father, grandfather, and so on. Lui was given a meaningful opportunity to impugn Orchid's DNA evidence, and he in fact did so to the best of his ability.

It is unclear how Lui's confrontation clause rights would be further vindicated by requiring the State to call "anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device . . . .," and the Supreme Court has never imposed such a requirement. *Melendez-Diaz*, 557 U.S. at 311 n.1. Indeed, such an onerous requirement would, "for all practical purposes, forbid[] the use of scientific tests in criminal trials." *Id.* at 332-33 (Kennedy, J., dissenting). Empirical data show that defendants frequently demand to confront scientific witnesses: since *Melendez-Diaz* was decided, some state laboratories have estimated that their backlog of drug tests has risen by 40 percent and their backlog of alcohol and toxicology tests has risen by 15 percent, resulting in delays or dismissals when lab technicians are unable to attend trials. Hon. G.

REPORT AND RECOMMENDATION - 21

Ross Anderson Jr., *Returning to Confrontation Clause Sanity. The Supreme Court (Finally) Retreats From Melendez-Diaz and Bullcoming*, 60 FED. Law. 67, 71 (2013).  In addition, an analyst may be unable to attend trial due to sickness, travel, inclement weather, or being called to testify in another trial.  *Melendez-Diaz*, 557 U.S. at 343 (Kennedy, J., dissenting).  An analyst may also die prior to trial, an issue not yet resolved by Supreme Court precedent. *Williams*, 132 S. Ct. at 2251 (Breyer, J., concurring).

The rule we adopt today avoids the risk of unduly burdening the use of scientific evidence, while preserving the benefits of using a multiplicity of analysts.  In the context of DNA testing, as many as 12 different analysts may be involved in a single case.  *Id*. at 2252 (Breyer, J., concurring). Spreading out the testing procedure among different analysts not only promotes "efficiency in the laboratory," 12 RP at 1572, it also is an important safeguard against fabrication. A laboratory that uses multiple analysts can segregate the analysts working on the suspect's sample from the analysts working on the crime-scene sample.  *Williams*, 132 S. Ct. at 2252 (Breyer, J., concurring). Screening off the analysts from each other frustrates the potential fabricator, who will have access to only one of the two DNA profiles needed for a match to exist.  Furthermore, the use of multiple analysts is also a useful safeguard against error because multiple analysts can review each other's work in a way that a single analyst cannot.

In short, we decline to adopt a rule that encourages laboratories to entrust cases to lone analysts, thereby giving the hypothetical rogue analyst more opportunities to fabricate results. More generally, we decline to adopt a rule that makes DNA evidence unduly burdensome to introduce because the use of less reliable eyewitness evidence may increase the risk of erroneous convictions.  *Id*. at 2251 (Breyer, J., concurring).  Neither result is helpful to defendants or to the State, and neither result furthers the confrontation clause's goals of checking potential error or fabrication.  Under our test, Pineda was the only person involved in Orchid's testing process who made a statement of fact that tended to inculpate Lui.  Thus Pineda was exactly the right analyst to satisfy the strictures of the confrontation clause.   The State properly introduced the DNA evidence through her.

(*Id*. at 28-36 (footnotes omitted).)

The state court also found no Confrontation Clause violation with the expert testimony

REPORT AND RECOMMENDATION - 22

regarding body temperature readings:

> Lui also asserts that the State was required to introduce the temperature readings of Boussiacos's body and the ambient temperature through the live testimony of Dr. Kathy Raven, who took those readings. But like the Orchid DNA analysts, Raven did not become a "witness against" Lui by merely taking temperature readings. She may have been a "witness" by virtue of recording the temperatures, thus creating factual information for later use by the court. But she did not do so "against" Lui. Like the raw DNA profile, Raven's temperature data had no relevance to Lui's case until Dr. Harruff used that data to estimate a range for the time of death. In fact, until Dr. Harruff determined that the time of death was consistent with the prosecution's theory, the temperature readings could well have benefited Lui. In other words, the first prong of our test was met – Raven created a factual statement of the temperature of Boussiacos's body and of the ambient environment. But the second prong was not met because these points of data could not inculpate Lui without the intervening analysis of an expert. Because Harruff used his expertise to turn raw data into a conclusion that inculpated Lui, it is Harruff and not Raven with whom the confrontation clause is concerned.

(*Id*. at 36-37.)

In seeking habeas relief, petitioner repeats "verbatim or nearly verbatim" the dissent by four members of the Washington Supreme Court. (Dkt. 14 at 26-32.) He avers the recitation of Raven's temperature measurements did not reflect Harruff's personal knowledge or opinion, that Pineda testified to the results of tests she did not perform or observe and about which she lacked personal knowledge, and that, although not admitted, the DNA report from a non-testifying analyst "was shown to the jury and Pineda effectively read the results into evidence by her testimony, describing results that were inextricably linked to her conclusions." (*Id*. at 27-28.)

Petitioner contends the Supreme Court rejected the test crafted by the state court in *Crawford*, *Melendez-Diaz*, *Bullcoming*, and, in part, in *Williams*. He states *Williams* merely affirmed the lower court's judgment without a holding and "stands as a single-case deviation" from

the majority opinions in *Melendez-Diaz* and *Bullcoming* and "is no broader than its facts." (*Id*. at 28-31.)  Further, under those facts, *Williams* showed only that an expert may testify to a DNA profile performed by a nontestifying analyst without triggering the Confrontation Clause if the profile is an informal report created to meet an ongoing emergency and to exclude possible suspects before the defendant was targeted, and the profile is never admitted, shown, read, or identified to the fact finder as a source of the expert's opinion in a bench trial.  Petitioner distinguishes the DNA testing in *Williams* that took place before a suspect had been identified, with the autopsy, toxicology screen, and DNA testing in this case, all of which occurred after his identification as a suspect.  He maintains the only conceivable purpose for recording temperatures and determining time of death was to support a criminal prosecution and was therefore inculpatory.

Petitioner does not, however, establish his entitlement to habeas relief.  "'[C]learly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court rendered its decision." *Lockyer*, 538 U.S. at 71-72.   It includes the holdings, as opposed to the dicta, of Supreme Court decisions.  *Howes v. Fields*, 565 U.S. 499, 505 (2012).  Where there are a "lack of holdings" from the Supreme Court on the issue presented for review, a state court decision cannot be contrary to clearly established federal law.  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

"The Supreme Court has not clearly established that the admission of out-of-court statements relied on by an expert violates the Confrontation Clause." *Hill v. Virga*, No. 13-15799, 2014 U.S. App. LEXIS 24366 at *2 (9th Cir. Dec. 23, 2014) (state court decision not unreasonable in finding no confrontation clause violation in admission of hearsay relied on by state's expert witness) (citing *Williams*, 132 S. Ct. at 2228, 2247-48, 2255).  *See also Williams*, 567 U.S. at 141 (Kagan, J., dissenting) (describing the holding of *Williams* as "to be frank – who knows what");

REPORT AND RECOMMENDATION - 24

*Stuart v. Alabama*, __ U.S. __, 139 S. Ct. 36, 36, 202 L. Ed. 2d 414 (2018) (Gorsuch, J., dissenting from denial of petition for writ of certiorari) (stating *Williams* "yielded no majority and its various opinions have sown confusion in courts across the country.")   The Ninth Circuit has, as a result, repeatedly upheld state court decisions allowing for the admission of expert testimony reliant on the statements of others.  *See, e.g., Peters v. Arnold*, No. 17-17485, 2019 U.S. App. LEXIS 11892 at *3 (9th Cir. Apr. 23, 2019) (confidential informants' statements offered as basis for expert's opinion, rather than for their truth); *Hill v. Lizarraga*, No. 16-55137, 2018 U.S. App. LEXIS 19885 at *2 (9th Cir. Jul. 18, 2018) (medical experts' testimony discussing findings of a non-testifying neuropathologist on the cause of death).  Allowable expert witness testimony extends to DNA evidence offered without testimony from the testing analysts.  *See, e.g.*, *Barba v. Montgomery*, No. 15-56522, 2018 U.S. App. LEXIS 3363 at *1-2 (9th Cir. Feb. 13, 2018) (admission of DNA reports harmless because, even if reports had been excluded, the jury heard testimony from the director of laboratory, who explained the results and was subject to cross examination); *Benjamin v. Gipson*, No. 12-56664, 2016 U.S. App. LEXIS  2898 at *5-6 (9th Cir. Feb. 8, 2016) (allowing inculpatory DNA evidence introduced through testimony of analyst who did not conduct testing, but was familiar with laboratory's procedures and subject to cross-examination; distinguishing *Melendez-Diaz*, where "no analyst testified as to the procedures underlying the forensic reports.") *See also Gibson v. Rackley*, No. 12-7179, 2015 U.S. Dist. LEXIS 160342 at *20-21 (C.D. Cal. Nov. 12, 2015) (expert's testimony not barred where expert testified about DNA profiles prepared by analysts in the same lab the expert supervised and, in contrast to *Melendez-Diaz*, reports were not "sworn affidavits" and were not read into evidence).

        Petitioner fails to show the state court unreasonably applied Supreme Court authority in finding no Confrontation Clause violation in relation to the DNA evidence and temperature

REPORT AND RECOMMENDATION - 25

readings. Instead, given the fractured decision in *Williams* "'fairminded jurists could'" and, indeed, did "'disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101. Because the Supreme Court has yet to conclude the admission of expert opinion testimony reliant on out-of-court statements of non-testifying individuals violates the Confrontation Clause, the state court decision is not contrary to or an unreasonable application of clearly established federal law. *See, e.g., Virga*, 2014 U.S. App. LEXIS 24366 at *2. *Cf. Glebe v. Frost*, 574 U.S. 21, 135 S. Ct. 429, 430-31 (2014) (while a Supreme Court decision held a *complete* denial of closing argument violated the Assistance of Counsel Clause and amounted to structural error requiring automatic reversal, it did not clearly establish the *restriction* of summation also amounts to structural error; state court could therefore reasonably conclude a restriction on presenting alternative theories in closing argument did not amount to structural error).

        b.    <u>Toxicology and autopsy evidence</u>:

The Washington Supreme Court did find a violation of the Confrontation Clause in relation to expert witness testimony addressing the toxicology and autopsy reports:

> Lui objects to the admission of evidence that Boussiacos had no drugs in her system at the time of death. He asserts that Dr. Richard Harruff had no personal knowledge about the toxicology screen on Boussiacos's body and did not offer his professional opinion about the results; rather, he argues that Harruff was merely a mouthpiece for the conclusions of an absent analyst. Similarly, Harruff testified to statements taken directly from the autopsy report about which he had no personal knowledge. These include that Boussiacos had bruising under her scalp and within her neck muscles, that her hair was in a ponytail, that she was wearing a long sleeve shirt that was pulled up toward her chest, that her bra was wadded up and placed underneath her shirt, and that the examining pathologist described certain scratches as "contusions."
>
> Lui is correct. Like the temperature readings, the information taken from the toxicology report and autopsy report were statements of fact. But unlike the temperature readings, these statements had an inculpatory effect: the toxicology report was

REPORT AND RECOMMENDATION - 26

prepared to identify the cause and manner of Boussiacos's death and relied upon at trial to rebut Lui's testimony that Boussiacos might have been smoking prior to her death. The statements from the autopsy report were also for the purpose of identifying the manner of death and were used to prove that Boussiacos was dressed postmortem. All of the statements were used by the prosecution to convict Lui. Furthermore, unlike Harruff's testimony based on the autopsy photographs or temperature readings, Harruff did not bring his expertise to bear on the statements or add original analysis—he merely recited a conclusion prepared by nontestifying experts. [([Unlike the DNA testing], the toxicology report was an inculpatory statement without being interpreted by Harruff.)] His testimony falls precisely within the scope of testimony proscribed by *Bullcoming*, and it was error to admit the toxicology report and statements from the autopsy report.

(Dkt. 9, Ex. 2 at 37-38.) However, the state court found the erroneous admissions harmless, explaining:

> . . . [T]he toxicology report does nothing to prove any element of the charges against Lui. Boussiacos's toxicology was implicated only to rebut Lui's statement to police that Boussiacos might have been murdered while sneaking out to smoke. Lui's false statement to investigators, however, was only one of many reasons for the jury to doubt Lui's credibility. As the prosecution showed, Lui repeatedly changed his accounts of when Boussiacos planned to depart for California, when she packed for her trip, and when he became aware of Boussiacos's intention to leave. Lui's testimony about his affair, his phone call with his sister at 1:00 a.m., Boussiacos's favorite pajamas, and Boussiacos's engagement ring was flatly inconsistent with the testimony of other witnesses. Finally, DNA evidence contradicted Lui's denial that he had had sexual intercourse with Boussiacos prior to her death. Aside from the toxicology report, the State produced significant evidence detracting from Lui's credibility.

> The statements taken from the autopsy report about Boussiacos's injuries were minor compared to the properly admitted evidence. Harruff, trained in forensic pathology, examined photographs taken both at the crime scene and during the autopsy. Harruff describes the injuries in the photographs in over 20 pages of direct-examination. Harruff testified that the photographs showed a number of prominent abrasions on Boussiacos's neck and petechiae [([s]mall red dots on the skin resulting from ruptured blood vessels[])] on her face, indicating strangulation and a struggle.

REPORT AND RECOMMENDATION - 27

There were also a number of other injuries, including bruising on her face, shoulders, left hand, and arm pit region. Harruff testified that the color of the abrasions indicated that the injuries occurred close to the time of death.

The other statements taken from the autopsy report were minor. Harruff was asked by the State if page 3 of the autopsy report indicated how Boussiacos's hair was styled. He responded that her hair was pulled back in a ponytail. However, the jury later saw a picture of the left side of Boussiacos's hair. The jury also saw photographs of Boussiacos's pants, underwear, shoes, and socks, indicating that she was abnormally dressed. Additionally, her shirt and shoes were present in court. Harruff's improper testimony was minor compared to the evidence properly admitted. And, properly admitted evidence corroborated most of his statements.

Significant other untainted evidence supported a finding of guilt. The State produced evidence showing Lui was angry that Boussiacos was going to "leave him and reclaim her own life," 14 RP at 1805; evidence suggesting that Boussiacos had died before she could dress or put on her customary makeup; evidence suggesting that Boussiacos had been dressed and her bags packed by "somebody who doesn't know anything about women," 14 RP at 1838; testimony that a police bloodhound led investigators directly to Lui; evidence of Lui's familiarity with the area where Boussiacos was found; and evidence of Lui's unusual conduct during the investigation. The weight of this evidence makes it implausible that the jury's verdict could be attributed to the toxicology and autopsy reports – evidence that was discussed in 2 pages of a nearly 2,000 page record. 10 RP at 1397-98. The cumulative, untainted evidence necessarily led to a finding of guilt, and thus the Court of Appeals correctly rejected Lui's confrontation clause challenge to the admission of the toxicology and autopsy reports.

(*Id.* at 38-41.)

A habeas petitioner is not entitled to relief where a constitutional error is harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Habeas relief results only where a constitutional error had a "'substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This standard is satisfied only if the record raises "grave doubt" about whether the error influenced the jury's decision. *Davis v.*

1   *Ayala*, ___ U.S. ___, 135 S. Ct. 2187, 2197-98, 2203, 192 L. Ed. 2d 323 (2015) (quoting *O'Neal*

2   *v. McAninch*, 513 U.S. 432, 436 (1995)).  There must be more than a "'reasonable possibility'" of

3   harm or "'mere speculation'" of prejudice; "'the court must find that the defendant was actually

4   prejudiced by the error.'"  *Id*. at 2198 (quoting *Brecht*, 507 U.S. at 637, and *Calderon v. Coleman*,

5   525 U.S. 141, 146 (1998) (per curiam)).  *See also Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th

6   Cir. 2010) ("'Grave doubt' exists in the 'unusual' circumstance where, 'in the judge's mind, the

7   matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the

8   error.") (quoting *O'Neal*, 513 U.S. at 435).

9       While a reviewing court, under AEDPA, must accord deference to a state's harmless error

10  determination, the Supreme Court has explained "a prisoner who seeks federal habeas corpus relief

11  must satisfy *Brecht*, and if the state court adjudicated the claim on the merits, the *Brecht* test

12  subsumes the limitations imposed by AEDPA."  *Davis*, 135 S. Ct. at 2198-99 (citing *Fry v. Pliler*,

13  551 U.S. 112, 119-20 (2007)).  Accordingly, the Court here asks whether, considering the record

14  as a whole, the admission of the toxicology and autopsy evidence substantially influenced the

15  verdict. *See Brecht*, 507 U.S. at 638-39.  In so doing the Court may consider, *inter alia*:

16          (1) the importance of the witness' testimony in the prosecution's
            case; (2) whether the testimony was cumulative; (3) the presence or
17          absence of evidence corroborating or contradicting the testimony of
            the witness on material points; (4) the extent of cross-examination
18          otherwise permitted; and (5) the overall strength of the prosecution's
            case.

19

20  *Merolillo v. Yates*, 663 F.3d 444, 455 (9th Cir. 2011) (citing *Delaware v. Van Arsdall*, 475 U.S.

21  673, 680, 684 (1986)).

22      Petitioner does not offer argument refuting the state court's finding of harmless error.  Nor

23  does the Court find substantial and injurious effect on the verdict.  The state court reasonably found

REPORT AND RECOMMENDATION - 29

the toxicology and autopsy testimony of minimal importance and cumulative of other evidence in the record, properly admitted evidence to corroborate most of the statements taken from the autopsy report, and the record to contain significant other evidence supporting a determination of guilt. The record does not raise grave doubt as to whether the admission of the improperly admitted evidence influenced the decision and therefore does not provide for habeas relief.

2.    Ineffective Assistance of Counsel (Grounds 2-5, 7-8, 10):

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Courts evaluate claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland*. Under that test, a defendant must prove that (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Id*. at 687-94.

When considering the first prong of the *Strickland* test, judicial scrutiny must be highly deferential. *Id*. at 689. There is a strong presumption that counsel's performance fell within the wide range of reasonably effective assistance. *Id*. The Ninth Circuit has made clear that "'[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

The second prong of the *Strickland* test requires a showing of actual prejudice. A petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

REPORT AND RECOMMENDATION - 30

The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id.* at 697. Furthermore, if both components are to be considered, there is no prescribed order in which to address them. *Id.*

Where a state court rejected an ineffectiveness claim on the merits the "pivotal question" in a § 2254 proceeding "is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct 770, 785 (2011) (citations omitted). The Court employs a "'doubly deferential'" review, taking a "'highly deferential' look at counsel's performance [pursuant to *Strickland*, and] through the 'deferential lens of 2254(d).'" *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2, 123 (2009), and *Strickland*, 446 U.S. at 689). A petitioner "must demonstrate that it was necessarily unreasonable" for the state court to rule as it did. *Id.*

a.    <u>Dog tracking evidence (Ground 2)</u>:

Petitioner alleges his counsel failed to competently investigate and present testimony rebutting the state's dog tracking evidence. As described by the Washington Supreme Court:

> Despite the prolonged police investigation, the detectives suspected Lui early on. They suspected that he probably strangled Boussiacos at home, finished packing for her, stuffed her body in the trunk of her car, drove the car to the WAC, abandoned it there, and walked home. To corroborate their theory, the detectives hired a scent-detection specialist to locate Lui's scent at the WAC. The scent tracking occurred on February 14, 2001 – 11 days after Boussiacos's car was first spotted at the WAC. The dog traced Lui's scent from the car directly to his home.
>
> Lui, however, was not charged with Boussiacos's murder until 2007. Lui maintained his innocence at trial and was represented by defense attorney Anthony Savage. At trial, Savage criticized the detectives for being so determined in their pursuit to convict Lui that they failed to test obvious articles of Boussiacos's clothing for DNA and ignored all exculpatory DNA and fingerprint evidence they did obtain. Savage got the State's experts to admit that there were nine fingerprints lifted from Boussiacos's car, none of which belonged to

REPORT AND RECOMMENDATION - 31

Lui, that there was DNA belonging to an unknown male on the gearshift skirt of her car, as well as DNA belonging to an unknown male on her shoelaces, and that there was sperm possibly belonging to an unknown male inside Boussiacos's vagina. Savage even got the detectives to admit there was an earlier murder in Woodinville involving a female victim a few weeks prior to Boussiacos's disappearance and that they never considered the possibility that these two murders might have been linked.

To refute the scent track evidence, Savage argued it was nearly impossible for the State's dog to track an 11-day-old scent trail left by Boussiacos's assailant when he or she abandoned the car at the WAC. Instead, Savage explained it was more likely that the dog was tracking the scent trail left by Lui eight days earlier when he and his friend Senisi Taumoefolau were at the WAC distributing missing person flyers to nearby businesses.

(Dkt. 9, Ex. 39 at 4-6.) The state court rejected plaintiff's ineffective assistance of counsel claim:

Lui further asserts Savage was ineffective for failing to exclude the State's scent track evidence and failing to introduce a scent-detection expert to counter the State's evidence. At trial, the State argued that its scent-detection dog was able to track the path Lui took 11 days earlier after he abandoned Boussiacos's car and body at the WAC and walked home. Savage sought to discredit this testimony by getting the State's expert to admit it was unlikely his dog could even track an 11-day-old scent trail left by Boussiacos's assailant and to admit it was more likely the dog was tracking the path Lui took while distributing flyers since that path was only 8 days old.

The State's expert testified, however, that it did not matter that Lui had been in the area passing out flyers closer in time to the dog's scent tracking because his dog could distinguish among scents left by the same person on different days. 8 RP at 1100-07. The expert explained that his dog was following the scent that matched the age of the scent on the clothes the police collected from Lui's home, which the jury was left to assume was worn about the same time as Boussiacos's disappearance since no evidence was admitted regarding when Lui wore those clothes.

Lui contends Savage should have hired a scent tracking expert for the defense to discredit the State's expert testimony that its dog could discern among scent particles left by the same person on different days. But "'[g]enerally the decision whether to call a

REPORT AND RECOMMENDATION - 32

particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics.'" *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 171, 288 P.3d 1.140 (2012) (plurality opinion) (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004)).

Savage's cross-examination of the State's expert reveals he had a plan to discredit the State's scent track evidence without the use of a defense expert. The State's expert, however, provided surprise testimony regarding his dog's extremely sensitive olfactory senses. While testimony from an expert for the defense certainly could have been helpful to counter that surprise testimony, Lui has not shown counsel knew or should have known that the State's expert would so testify. He therefore fails to show Savage's strategy to discredit the State's scent track evidence through cross-examination alone was an unreasonable strategy.

Moreover, Lai fails to prove prejudice. Lui simply concludes it was critical to rebut the State's scent track evidence because one of the prosecutors described the evidence as "the best piece of evidence we have" during the early stages of the State's investigation. App. to Pers. Restraint Pet., at 105. Even without the scent track evidence, the reliability of which was strenuously debated at trial, the remainder of the State's evidence pointed to the murder occurring at Boussiacos's home after she had dressed for bed and before she had finished packing for her trip, and supported the inference that her assailant had dressed her and finished packing for her.

There was no evidence that anyone other than Lui had access to the couple's home, since the couple had just moved into the home a month earlier and there were no signs of a break-in. *See* 8 RP at 998. Indeed, Lui confirmed that he and Boussiacos were home alone the entire night. 9 RP at 1322. He explained that they watched the news on television until he fell asleep on the couch at about 12 a.m., and that Boussiacos was gone by the time he woke at 7 a.m. the next morning. Lui's cell phone records, however, contradicted that timeline, documenting that Lui had called and later spoke with his sister at around 1:30 a.m. that morning. 7 RP at 811. His downstairs neighbor also testified that he heard footsteps upstairs at around 3:15 a.m., 5 RP at 583, 593, and that Lui inquired later that morning about the location of the light switch for their shared driveway, informing the neighbor that he was "going crazy" the night before trying to turn off that light, *id.* at 595.

REPORT AND RECOMMENDATION - 33

1       Lui's related claim that Savage should have objected to the
2   admission of the State's scent track evidence pursuant to *State v.
    Lord*, 161 Wn.2d 276, 294-96, 165 P.3d 1251 (2007), also fails.
3   *Lord* is not analogous. In *Lord*, we held the trial court did not abuse
    its discretion in excluding a scent track expert on behalf of the
4   defense because the expert could not narrow when, within a two-
    week window, the scent trail was left by the victim. *Id*. at 294-95 &
5   n.16, 165 P.3d 1251. In *Lord*, it was undisputed that the victim had
    walked that same path numerous times during those two weeks. *Id*.
6   at 295. The issue therefore was whether the dog tracked the victim's
    path on the day she disappeared, as the defense argued, or on an
7   earlier date, as the State argued. *See id*. Without specifying a date,
    the expert's testimony was helpful to neither the State nor the
8   defense, and we held the trial court did not abuse its discretion in
    excluding that evidence as a result. *Id*.  We, however, specifically
9   recognized that "*if* the dog handler had been able to determine that
    the scent track was from the date of the crime, such evidence might
10  have been admissible and relevant." *Id*.

11      Unlike the victim in *Lord*, Lui walked the path tracked by
    the State's dog only once. The debate at trial centered on when and
12  why he walked that path. Did he walk that path after he disposed of
    Boussiacos's car and body at the WAC, or did he walk that path
13  when he was distributing flyers? The State argued the path Lui took
    was inconsistent with someone passing out flyers because of the
14  irregular route taken and because Lui failed to pass out any flyers
    along that route. Thus, unlike the party proffering the scent track
15  evidence in *Lord*, the State in this case could date the scent trail
    through other circumstantial evidence. Moreover, unlike the
16  defense's expert in Lord, the State's expert *did* testify, albeit to
    Savage's surprise, that his dog could distinguish between different
17  trails left by the same person on different days and that the dog
    tracked the scent trail that matched the age on Lui's clothing. 8 RP
18  at 1100-07. Given these critical differences, Lui has not proved the
    trial court was required to exclude the State's scent-track evidence
19  pursuant to *Lord* and consequently fails to prove be was prejudiced
    by counsel's failure to seek its exclusion.

20  (*Id*. at 16-22 (also rejecting contention counsel should have argued dog tracked Boussiacos's scent

21  and should have called an expert to explain the scent trail through nearby bushes could not coincide

22  completely with trail taken).)

23

REPORT AND RECOMMENDATION - 34

Petitioner argues the expert's testimony the dog could differentiate between scents left by the same person on different days "eviscerated" the theory the dog picked up his scent from when he put up missing person posters.  He criticizes the state court's determination of facts without an evidentiary hearing, asserting an absence of evidence counsel was surprised and describing counsel's post-trial declaration as showing he did not understand the import of the expert testimony.  He also points to a post-conviction expert declaration contradicting the state's expert.

Petitioner avers ineffective assistance in his counsel's failure to investigate, adequately prepare, or retain countervailing expert testimony.  He maintains the failure to investigate fell below the standard of practice for reasonably competent counsel and rendered any trial strategy decision deficient.  *See Hinton v. Alabama*, 571 U.S. 263, 274-75 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made '*after thorough investigation of [the] law and facts*,' is 'virtually unchallengeable.'") (quoting *Strickland*, 466 U.S. at 690) (emphasis added); *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) ("Counsel cannot justify a failure to investigate simply by invoking strategy. . . . Under *Strickland*, counsel's investigation must determine trial strategy, not the other way around.")  He denies any objectively reasonable explanation to not investigate a dog's ability to distinguish between scents.

Petitioner also deems the state court's finding of no prejudice unreasonable.  He maintains the court failed to consider how he was harmed and how his post-conviction evidence would have significantly improved his defense.  He contends the state court assumed away the issue by positing the crime must have been committed in the residence, despite the absence of evidence.

Petitioner's arguments are not persuasive.  The mere fact the state court did not hold an evidentiary hearing does not render its factual determination unreasonable.  AEDPA does not

REPORT AND RECOMMENDATION - 35

require that a state court hold an evidentiary hearing.  *Lambert v. Blodgett*, 393 F.3d 943, 969 n.16 (9th Cir. 2004).  "A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question."  *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012).  *Cf. Hurles v. Ryan*, 752 F.3d 768, 784-92 (9th Cir. 2014) (finding denial of evidentiary hearing on claim of judicial bias unreasonable where the judge accused of bias made findings involving her own conduct and "based those 'findings' on her untested memory and understanding of the events.")

Nor was the state court's determination unreasonable.  "Under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill."  *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000).  Strategic trial decisions "rest[] upon the sound professional judgment of the trial lawyer[,]" *Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980), and reasonable tactical choices are "immune from attack under *Strickland*."  *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997).  *Accord Strickland*, 466 U.S. at 689-91. "Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial."  *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999).

Defense counsel's post-trial declaration shows he did investigate the dog tracking evidence.  Counsel conferred with an expert who advised a bloodhound could not track a scent trail as old as the one in this case.  (Dkt. 9, Ex. 26, App. C at 4.)  The state court therefore reasonably deduced counsel was surprised by testimony the dog could not only track eleven-day-old scents, but could differentiate between those scents and eight-day-old scents from the same person.

Counsel also described his "'big picture'" strategy of holding the state to its burden of proof, trusting the jury to "spot red herrings or 'rabbit trails' of peripheral, unconvincing

1   evidence[,]" and challenging such evidence through cross-examination, rather than assuming the

2   burden of convincing the jury to favor a defense expert's testimony over that of the prosecution's

3   expert.  (*Id*. at 3.)  He sought to avoid offering expert testimony the prosecution could have

4   discredited, noting "[t]he dog in this case clearly tracked something, because it traveled from the

5   location of the victim's car" to the house and "[t]he handler and dog had no way of knowing where

6   the defendant and victim lived."  (*Id*. at 4.)  He found it strategically better to argue the scent trail

7   "was easily explained away" by petitioner's distribution of flyers.  (*Id*.)

8           As found by the state court, counsel's strategy was objectively reasonable.  Review of the

9   trial transcript reveals counsel obtained a number of favorable admissions from the expert pursuant

10  to this strategy.  Counsel, for example, succeeded in establishing a scent could be transferred

11  between clothing in a hamper, that the skin cells from which the scent derives could be blown

12  around by the wind, that older scent trails of up to fifteen days are "dicey", and that the state's

13  expert could not tell precisely the day on which a person deposited a scent.  (Dkt. 13, Ex. 48 at

14  1083-1106.)  When counsel asked whether the "scent could have been laid down . . . a couple days

15  after the body was found[,]" the expert testified:  "Well, if the person walking around putting up

16  flyers is the same scent, that led from the parking lot where the car was found, then, yes."  (*Id*. at

17  1106.)  The expert also conceded that, although it would have been at the "outer limits" of his

18  dog's capabilities, the scent could have been laid down before the victim's body was found.  (*Id*.)

19  The record does not, in sum, support petitioner's contention counsel rendered ineffective

20  assistance.  *Cf. Hinton*, 571 U.S. at 273 (finding counsel's decision to not seek additional funds

21  to hire an expert unreasonable where failure "was based not on any strategic choice but on a

22  mistaken belief that available funding was capped at $1,000."); *Weeden*, 854 F.3d at 1069-71 (not

23  reasonable for counsel to conclude a psychological examination would conflict with trial strategy

1   without first knowing what the examination would reveal and failure to investigate not justified by

2   fear results could be used against client given that state law required disclosure of reports intended

3   to be relied upon, not any report procured).

4       The state court also reasonably found no prejudice.  A value placed on the dog tracking

5   evidence by the prosecution during the investigation does not compel the conclusion it retained

6   that status at the time of trial.  Defense counsel's cross-examination brought out the limitations of

7   the evidence and the prosecution presented significant other evidence to support its case, including

8   evidence the perpetrator had access to the residence shared by Liu and Boussiacos and other

9   evidence contradicting petitioner's depiction of the timeline of events.

10      b.    <u>Sleeping or functionally absent counsel (Ground 3)</u>:

11      Petitioner alleges his counsel slept during and was functionally absent from significant

12  portions of trial.  The Washington Supreme Court rejected this claim:

13          Lui contends that Savage was inattentive during trial. He

14  alleges that Savage dozed off at times, was forgetful, and suffered
    from a knee injury that caused him to deteriorate mentally and
    physically. Pers. Restraint Pet. at 8-9. Lui submits several

15  declarations from trial attendees who question whether Savage was
    fully alert during trial. App. to Pers. Restraint Pet. at 29 (Decl. of

16  Sione Lui for Pers. Restraint Pet.) ("He dozed off several times."),
    34 (Decl. of Grant Mattson) ("Mr. Savage did not look particularly

17  alert at many points during the trial."), 35 (Decl. of William Harris)
    ("Anthony Savage did not seem to be very alert during the trial.").

18  Allegations of sleeping counsel and mental unfitness are serious,
    and if proved, may support a finding of deficient performance. *In re*

19  *Pers. Restraint of Caldellis*, 187 Wn.2d at 145 n.6 (listing cases
    where counsel was found deficient for having fallen asleep during

20  critical portions of trial); *State v. Abercrombie*, No. 60603-4-1,
    noted at 151 Wn. App. 1052, 2009 WL 2595007, at *4 ("'[S]leeping

21  counsel is tantamount to no counsel at all.'") (quoting *United States
    v. DiTommaso*, 817 F.2d 201, 216 (2d Cir. 1987)).

22

23          To prevail on an ineffective assistance claim, however, a
    defendant must prove more than deficient performance; he must
    prove prejudice. *In re Pers. Restraint of Caldallis*, 187 Wn.2d at

REPORT AND RECOMMENDATION - 38

144-45. Lui fails to specify how he was harmed by counsel's alleged sleeping. He does not cite to any particular moment when counsel was alleged to have been sleeping. Nor do we observe any signs that counsel was sleeping or otherwise inattentive in the record to form a basis for evaluating prejudice.

The record shows the trial judge was acutely observant of the courtroom and cautious of possible grounds for ineffective assistance claims. Twice the trial judge cited jurors for perceived inattentiveness. 5 RP at 442 (juror's use of electronic device); 9 RP at 1277 (juror's head was down and his eyes appeared closed). At no time, however, did the judge ever indicate that defense counsel was sleeping or otherwise inattentive. To the contrary, the record demonstrates that Savage, as the only attorney present on Lui's behalf, remained engaged throughout trial. Savage made numerous evidentiary objections during the State's case in chief based on relevancy, hearsay, the confrontation clause, and evidence preservation. US. CONST. amend. VI; WASH. CONST. art. 1, § 22; *e.g.*, 5 RP at 434-38; 6 RP at 643-50, 761-62; 7 RP at 869-77; 8 RP at 932-33, 953, 975-81, 1034; 9 RP at 1177-81, 1200-07, 1243-45; 10 RP at 1344-47, 1352, 1336-72. He also conducted several strategically timed voir dires of the State's witnesses during direct examination in an attempt to undermine the strength of their anticipated testimony. *See, e.g.*, 6 RP at 773-81; 7 RP at 859, 884-85, 894, 896, 916, 984-85; 9 RP at 1188, 1252-53, 1306; 10 RP at 1353, 1358; 12 RP at 1489, 1494-95, 1512-13, 1588-89. Savage even reminded the judge at one point that the judge had failed to provide a final ruling on an earlier matter. 9 RP at 1207; 12 RP at 1481. He also reminded the State that it could not discuss certain pieces of evidence because that evidence had not yet been admitted. 6 RP at 762, 8 RP at 985-86.

Although Savage did suffer a fall during trial, the trial judge quickly noted the injury on the record and provided counsel a one-day recess, which with the weekend amounted to four days off, to recover and avoid any potential claims of ineffective assistance. 11 RP at 1466, 1469-71. After the recess, the trial judge appeared to have no further concern about Savage's health other than with his inability to stand and walk, for which he was excused. 12 RP at 1476, 1562.

In the absence of prejudice, Lui is not entitled to relief. Nor is he entitled to a reference hearing to determine whether counsel was actually sleeping. To obtain a reference hearing; Lui must raise disputed material facts that, if proved, would establish prejudice sufficient to entitle him to relief. *In re Pers. Restraint of Caldellis*,

REPORT AND RECOMMENDATION - 39

1    187 Wn.2d at 146; *In re Pers. Restraint of Rice*, 118 Wn.2d 876,
2    885-86, 828 P.2d 1086 (1992). Lui fails to prove prejudice meriting
     a reference hearing.

3    (Dkt. 9, Ex. 39 at 10-13.)

4        Petitioner asserts the evidence shows his counsel, on more than one occasion, slept through

5    portions of his trial.  He avers that, pursuant to *United States v. Cronic*, 466 U.S. 648, 659 (1984),

6    the state court should have presumed prejudice because the absence of counsel constituted a

7    structural error that does not require a showing of prejudice.  *See, e.g., Burdine v. Johnson*, 262

8    F.3d 336, 341 (5th Cir. 2001) ("[A] defendant's Sixth Amendment right to counsel is violated

9    when that defendant's counsel is repeatedly unconscious through not insubstantial portions of the

10   defendant's capital murder trial. Under such circumstances, *Cronic* requires that we presume that

11   the Sixth Amendment violation prejudiced the defendant."); *see also United States v. Hamilton*,

12   391 F.3d 1066, 1068 (9th Cir. 2004) (finding structural defect where counsel left courtroom during

13   a "brief redirect" examination of a government witness at a suppression hearing).  That is, because

14   counsel's sleeping prevented him from assisting petitioner during a critical stage of the

15   proceedings, *Cronic*, not *Strickland* applied and "'a presumption of prejudice is appropriate

16   without inquiry into the actual conduct of the trial[.]'"  *Wright v. Van Patten*, 552 U.S. 120, 124

17   (2008) (per curiam) (quoting *Cronic*, 466 U.S. at 659-60).

18       Petitioner alternatively requests an evidentiary hearing in this Court.  He denies any

19   deference is due the state court decision in that it either did not decide whether counsel was

20   sleeping "or did so through a patently unfair process."  (Dkt. 14 at 8.)

21       A criminal defendant has a right to be represented by counsel at all critical stages of a trial

22   and a violation of that right mandates reversal, without an inquiry into prejudice.  *Cronic*, 466 U.S.

23   at 658-59.  In *Cronic*, 466 U.S. at 658-60 & n.25, the Supreme Court identified circumstances "so

REPORT AND RECOMMENDATION - 40

1    likely to prejudice the accused that the cost of litigating their effect in a particular case is

2    unjustified[,]" including:  (1) "the complete denial of counsel . . . at a critical stage," when "counsel

3    [is] either totally absent, or prevented from assisting the accused during a critical stage of the

4    proceeding";  (2) "if counsel entirely fails to subject the prosecution's case to meaningful

5    adversarial testing"; and (3) "when although counsel is available to assist the accused during trial,

6    the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so

7    small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the

8    trial."  *Cronic's* presumption of prejudice applies only where the attorney's failure is "complete."

9    *Bell v. Cone*, 535 U.S. 685, 696-98 (2002) (court must consider proceeding as a whole; that counsel

10   failed to subject prosecution's case to meaningful adversarial testing only at some points generally

11   does not trigger presumption of prejudice; finding state court correctly applied *Strickland* to a

12   failure to present certain mitigating evidence at sentencing and waiver of final argument).

13   However, as respondent observes, there is no Supreme Court holding applying the *Cronic*

14   presumption of prejudice to a claim a defense counsel slept during or was otherwise functionally

15   absent during parts of a trial.  *Cronic* addressed circumstances in which a young, inexperienced

16   and newly appointed attorney had little time to prepare for a complex case.  466 U.S. at 649-50.

17   The Supreme Court has clarified the limitations to extending the reach of *Cronic*.  For example, in

18   *Woods v. Donald*, __ U.S. ___, 135 S. Ct. 1372, 1377-78, 191 L. Ed. 2d 464 (2015), the Supreme

19   Court rejected the application of *Cronic's* presumption of prejudice to a counsel's temporary

20   physical absence from trial testimony regarding other defendants.  Because none of the Court's

21   cases confronted the specific question presented in *Woods*, the decision of the state court could not

22   be deemed "contrary to" any holding from the Supreme Court.  *Id.* (citing *Lopez v. Smith*, 574 U.S.

23   1, 135 S. Ct. 1, 4, 190 L. Ed. 2d 1 (2014) (per curiam)).  Circumstances merely "'similar to'"

REPORT AND RECOMMENDATION - 41

Supreme Court precedents are not "'contrary to'" the Court's holdings and "where the precise contours of [a] right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *Id.* (internal quotation marks and quoted sources omitted). In *Wright*, 552 U.S. at 120-25, the Court found it could not be said a state court unreasonably applied *Strickland* in considering a counsel's appearance at a plea hearing via speakerphone. The Court noted *Cronic's* recognition of a "'narrow exception'" to the holding in *Strickland* and clarified it had not squarely addressed or clearly established "*Cronic* should replace *Strickland* in this novel factual context." *Id.* at 124-25 (quoting *Florida v. Nixon*, 543 U.S. 175, 190 (2004)).

The circuit court decisions relied upon by petitioner do not provide the clearly established federal law required for habeas relief. *Frost*, 135 S. Ct. at 431 (rejecting use of circuit court precedent to "bridge the gap" between Supreme Court holdings and the different circumstances at issue in the case; "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'") (quoting §2254(d)(1)); *Lopez*, 135 S. Ct. at 4 ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)). Nor do they entail the same circumstances. *See, e.g., Burdine*, 262 F.3d at 338, 349 (finding a presumption of prejudice compelled when a state court found "on the basis of credible evidence that defense counsel repeatedly slept as evidence was being introduced against a defendant", but declining to "adopt a per se rule that any dozing by defense counsel during trial" merited that presumption: "Our holding, that the repeated unconsciousness of Burdine's counsel through not insubstantial portions of the critical guilt-innocence phase of Burdine's capital murder trial warrants a presumption of prejudice, is limited to the egregious facts found by the state habeas

court in this case.");[1] *Musladin v. Lamarque*, 555 F.3d 830, 836-43 (9th Cir. 2009) (finding *Cronic* "directly on point" in case where there was "no question" the petitioner was denied counsel during the court's formulation and delivery of a response to a jury note, but concluding state court was "not objectively unreasonable in holding that a mid-deliberations communication to the jury that does no more than refer the jury back to the original jury instructions is not a 'critical stage' under *Cronic*.")  *See also Dows*, 211 F.3d at 485-86 (finding reasonable state court's rejection of argument that counsel's Alzheimer diagnosis after trial required presumption of prejudice; "The mere fact that counsel may have suffered from a mental illness at the time of trial, however, has never been recognized by the Supreme Court as grounds to automatically presume prejudice.") (citing *Smith v. Ylst*, 826 F.2d 872, 876 (9th Cir. 1987)).

The Court also finds no basis for habeas relief under *Strickland*.  The state court reasonably concluded petitioner failed to establish prejudice.  That is, the court properly considered the absence of signs counsel was sleeping or otherwise inattentive during the trial and other evidence suggesting to the contrary, including the behavior of the trial judge and counsel's activity throughout the trial.  *See, e.g.*, *Murray v. Schriro*, 882 F.3d 778, 818-20 (9th Cir. 2018) (despite testimony from some witnesses at evidentiary hearing that counsel had appeared to sleep during the trial, the court found the record of proceedings confirmed the reasonableness of the state court's finding counsel was not sleeping, including "the state's demonstration from the transcripts that counsel was actively questioning witnesses and objecting to testimony").

---

[1] While the Ninth Circuit similarly considered whether counsel had slept through a "substantial portion" of trial in several pre-AEDPA cases, *see, e.g., Javor v. United States*, 724 F.2d 831, 833 (9th Cir. 1984), it subsequently clarified this "substantial portion" test had not been endorsed by the Supreme Court and did not constitute clearly established federal law under AEDPA.  *Murray v. Schriro*, 882 F.3d 778, 818 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 414 (2018).

Nor does petitioner demonstrate the need for an evidentiary hearing. Instead, the question regarding counsel's attentiveness during the trial can be resolved based on the state court record.

       c.     <u>Failure to object (Grounds 4 and 5)</u>:

Petitioner challenges counsel's failure to object to a police officer's testimony implying her belief as to his guilt and to related statements by the prosecutor during closing argument. The Washington Supreme Court first addressed this claim as follows:

> Lui contends Savage was deficient for failing to object when Detectives Christina Bartlett and Susan Peters testified that they believed Lui had lied during police interviews. Police officers are generally not permitted to testify about a defendant's veracity. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion) ("[N]o witness may offer testimony in the form of an opinion regarding the guilt or veracity of the defendant."). But an officer may repeat statements made during interrogation accusing a defendant of lying if such testimony provides context for the interrogation. *Id.* at 763-64 (discussing *State v. O'Brien*, 857 SW.2d 212, 221 (Mo. 1993), and *Dubria v. Smith*, 224 F.3d 995, 1001-02 (9th Cir. 2000)); *see also State v. Kirkman*, 159 Wn.2d 918, 931, 934, 155 P.3d 125 (2007).

> Bartlett's testimony stayed mostly within this permissible boundary. Bartlett initially testified that she interviewed Lui in 2006 because she wanted him to explain the "lies" he told during earlier interviews, but she immediately clarified that she was referring to inconsistencies in the file, rather than actual lies told by Lui.[] 10 RP at 1449-53. In contrast, Peters went too far. She testified that "the object of [the] interview was to get more information on specifics that had never been answered and [her] goal was to get the truth and a confession," and explained she "would have loved to have a confession, the truth." 14 RP at 1720. Together, Peters's statements implied a belief on the detective's part that Lui was guilty.

> Nonetheless, Lui cannot prevail because he cannot prove defense counsel's failure to object to these statements was unreasonable. Counsel wanted Peters to testify that the goal of the interrogation was to obtain a confession from Lui. That testimony laid the foundation for his defense that the detectives targeted Lui early on as a suspect and manipulated him throughout their interrogation with lies about fictitious suspects and

REPORT AND RECOMMENDATION - 44

misrepresentations regarding the evidence in an effort to coerce him to confess to a murder he did not commit.

Lui's related but separate prosecutorial misconduct claim based on the detective's testimony fails as well. The disputed testimony was elicited by *defense* counsel, not the prosecutor, during cross-examination to support the defense theory that the detectives had fixated on Lui as a suspect, blatantly lied to him, and badgered him throughout hours of interrogation in a futile attempt to get him to confess to a crime he did not commit.

(Dkt. 9, Ex. 39 at 32-43 (footnote omitted).)  The state court subsequently held:

Lui further contends Savage was deficient for failing to object when the detectives and the prosecutor told the jury his reactions to Boussiacos's death did not align with the reactions of a "'grieving fiancé[]'" or an "'innocent man.'" Pers. Restraint Pet. at 43-45. Whether a defendant is innocent or guilty is a question solely for the jury. *State v. Todd*, 78 Wn.2d 362, 375, 474 P.2d 542 (1970). On the issue of bereavement, a witness may testify that defendant showed no signs of grief so long as the conclusion is logically supported by personal observations and the witness does not attempt to testify as an expert on whether the defendant's reaction was that of a truly bereaved person. *See State v. Stenson*, 132 Wn.2d 668, 721-24, 940 P.2d 1239 (1997)[].

Peters testified that she and Bartlett presented "several questions to [Lui] that were lies that were test questions, to see how he would respond, being the grieving fianc[é]." 14 RP at 1720. She explained that "[they] were expecting, if it was a *true victim* . . . or someone [who] had a family member murdered, that the reasonable person to [her] would ask, 'who are those suspects? When are you going to arrest them?'" *Id*. at 1722 (emphasis added). She testified that Lui never asked any of those questions.

To prevail on his ineffective assistance claim, Lui must prove counsel acted unreasonably, without legitimate trial strategy or tactic, in failing to object to that testimony. Notably, defense counsel was the one who elicited the challenged testimony. Rather than object to this testimony, he used it to force Peters to admit that Lui's failure to inquire about the status of the State's investigation or the identities of the fictitious suspects was not evidence of guilt. *Id*. Thus, regardless of whether Peters's testimony fell outside the permissible scope of opinion testimony, Savage's decision to

REPORT AND RECOMMENDATION - 45

undercut the force of that testimony through cross-examination, rather than an objection is not without legitimate trial strategy.

Moreover, counsel's decision not to object to Peters's testimony allowed him to respond effectively to Bartlett's otherwise permissible testimony. Bartlett never opined about Lui's guilt or innocence. Instead, she testified that when she interviewed Lui years after Boussiacos's murder, he never asked her about the status of the investigation or the identities of any suspects even though she had expected him to so inquire. 10 RP at 1437, 1453-54. Specifically, she testified that she misled Lui into believing the State had two suspects because she wanted to see if "he would ask about anybody who was a suspect in the death of his fianc[é] or what their relationship was or questions that [she] thought he would, anybody would ask." *Id.* at 1437. She further explained that "very much like people who lose great people who are very important in their life," she believed "one of the common things that someone would say is, 'oh, I feel some sense of relief, some sense of wanting to know what happened to the love of their life, who was involved, how it happened, how we got to this information and do expect some relief.'" *Id.* at 1453-54. In addition to not asking those questions, she added that Lui never appeared angry or upset and never questioned her about why the investigation was taking so long. *Id.* at 1437. Although Bartlett never specifically opined on the reactions of true victims, Savage was nevertheless able to rebut her testimony by getting Peters to admit later that Lui's failure to ask those questions or react in a certain way was not evidence of guilt.

Lui's related challenge regarding defense counsel's failure to object when the prosecutor suggested Lui's reaction was inconsistent with that of an "innocent man" also fails. During closing, the prosecutor explained:

> We know that an *innocent man* would have kicked and screamed over the length of this investigation and how long it took to solve.

> He would have screamed at the detectives the night that [s]he was found instead of saying, I have to go to her. I have to go to her, pounding on the table. He would have asked who did it, how did it happen?

> Where are your leads? What is going on? He would have wanted to know everything about the two

new suspects that he was told about. He didn't ask once about anything like that.

He would not have sat watching TV and dosing [sic] with the remote while the detectives are searching his house.

14 RP at 1849-50 (emphasis added).

Although prosecutors have wide latitude during closing argument to draw inferences from the evidence, *Thorgerson*, 172 Wn.2d at 453, it is impermissible for a prosecutor to express a personal opinion as to the credibility of a witness or the guilt of the defendant. *State v. McKenzie*, 157 Wn.2d 44, 53-54, 134 P.3d 221 (2006). Nonetheless, "'there is a distinction between the individual opinion of the prosecuting attorney, as an independent fact, and an opinion based upon or deduced from the testimony in the case.'" *Id*. at 53 (emphasis omitted) (quoting *State v. Armstrong*, 37 Wash. 51, 54-55, 79 P. 490 (1905)). To determine whether the prosecutor is expressing a personal opinion of the defendant's guilt, independent of the evidence, a reviewing court views the challenged comments in context:

"It is not uncommon for statements to be made in final arguments which, standing alone, sound like an expression of personal opinion. However, when judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the evidence. Prejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion."

*Id*. at 53-54 (emphasis omitted) (quoting *State v. Papadopolous*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)).

The State defends the prosecutor's statements as a reasonable inference drawn from the detectives' testimony about the reaction they had expected from Lui. However, as previously detailed, the detectives never testified that innocent people react a certain way. At most, Peters testified that a "true-victim" would ask certain questions but then admitted that Lui's failure to ask those questions was not evidence of his guilt. It was, therefore, improper

1    for the prosecutor to compare Lui's grieving process against her
2    perceptions of how an "innocent man" grieves, especially given the
     vast differences in cultural and individual mourning processes.

3         However, for Lui to prevail on his ineffective assistance
4    claim, he must prove more than just prosecutorial misconduct; he
     must prove deficient performance by defense counsel and resulting
5    prejudice. Lui fails to prove prejudice. The State's closing
     encompassed 49 pages. In those 49 pages, the prosecutor described
6    Lui's history of jealousy and control and Boussiacos's decision to
     leave him. The prosecutor then described how Boussiacos was
7    unusually dressed and her luggage unusually packed when police
     officers discovered her body. From that evidence, the prosecutor
8    opined that Boussiacos was probably murdered at night because she
     wore sweat pants only to bed and was wearing them when she was
9    found. This evidence pointed to Lui as the assailant since he was
     home alone with Boussiacos that evening. Indeed, phone records
10   documented that Lui was awake and called his sister at 1:30 a.m.
     that morning, even though he claimed to be sleeping at the time. The
11   prosecutor explained that whatever the substance of that
     conversation was, it gave his sister reason to question whether Lui
12   had a role in Boussiacos's disappearance. The prosecutor also
     highlighted the presence of DNA matching Lui's paternal bloodline
13   on Boussiacos's shoelaces, the many inconsistent statements he told
     the police throughout the investigation, and the scent track evidence
14   that traced Lui's scent particles from Boussiacos's car at the WAC
     to his home.

15        Lui has not proved by a reasonable probability that the result
16   of the trial would have been different in the absence of the
     prosecutor's singular reference to the behaviors of an innocent man.
     Thus, Lui's claim of ineffective assistance fails.

17

18   (*Id*. at 36-42 (footnote omitted).)

19   Petitioner argues competent counsel could have introduced the detectives' statements

20   without also introducing the harmful, inadmissible opinions of guilt, and could have both objected

21   to improper testimony and arguments and presented the theory police failed to investigate other

22   suspects.   He challenges the suggestion his counsel acted strategically as unsupported,

23   unreasonable, and illogical.   He avers a reasonable likelihood of a different outcome had the

REPORT AND RECOMMENDATION - 48

1  detective's testimony and the improper opinions of the prosecutor been excluded through objection

2  and a curative instruction.

3      The court is not persuaded.  The state court reasonably construed the record to reflect a

4  strategy of showing detectives fixated on petitioner to the exclusion of other suspects and

5  repeatedly lied and engaged in other investigative tactics in an attempt to force a confession.  (*See,*

6  *e.g.*, Dkt. 13-5 at 121-28, 348-350, 355-65; Dkt. 13-6 at 71-73.)  This strategy was apparent in

7  arguments raised before the trial began (Dkt. 13-1 at 41), in counsel's opening remarks (Dkt. 13-

8  2 at 62-65 ("I am afraid that the evidence is going to show that the police lied to him in order to

9  get him to implicate himself, deliberately lied.  They will have to admit it from the stand."), in his

10  cross-examination of other witnesses (*see, e.g.*, Dkt. 13-4 at 74), and in closing (*see, e.g.*, Dkt. 13-

11  6 at 216 ("I tried in cross examination and I want to set the stage for you as best I can.  [Detectives

12  Bartlett and Peters] are two experts. . . .   [T]hey start to grind on him. . . . They lie to him.  They

13  badger him.  They interrupt him.  They misstate what the record shows.  The object is to get him

14  to confess.  Never mind.  This nonsense about we needed more information.  They [had all] the

15  information that they needed six or seven years before.  What they wanted in the course of

16  badgering and interruption and their lying and their false representations to him was to confess.

17  He didn't do it. . . "))  While petitioner may disagree with this strategy, he does not show it was

18  objectively unreasonable.

19      The state court likewise reasonably declined to find ineffective assistance in relation to the

20  closing.  "The arguments of counsel are generally accorded less weight by the jury than the court's

21  instructions and must be judged in the context of the entire argument and the instructions."  *Ortiz-*

22  *Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) (citation omitted).  "Because many lawyers

23  refrain from objecting during opening statement and closing argument, absent egregious

1    misstatements, the failure to object . . . is within the 'wide range' of permissible professional legal

2    conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993).  Attorneys commonly

3    refrain from objecting during closing to avoid highlighting the remarks of the opposition.

4    *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013).

5          In this case, as discussed below, the state court reasonably found the prosecutor's improper

6    comments, viewed in the context of his extensive closing argument, were no more than isolated

7    incidents and did not result in actual prejudice.  *See, e.g., Hall v. Whitley*, 935 F.2d 164, 165-66

8    (9th Cir. 1991) (prosecutor's remarks were "isolated moments in a three day trial.")  It cannot be

9    reasonably said that, but for the failure to object, the result of the proceedings would have been

10   different.  *See, e.g.*, *Cunningham*, 704 F.3d at 1159  (closing remarks constituted a single paragraph

11   of a twenty-page argument and trial judge explained to the jury closing arguments are not

12   evidence); *Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) (petitioner failed to show

13   mistake in failing to object to improper argument was of such magnitude that, absent that failure,

14   petitioner would have been acquitted; noting other independent evidence of guilt and jury

15   instruction that counsel's statements were argument, not evidence).

16          d.    Arm injury (Ground 7):

17          Petitioner avers ineffective assistance in failing to investigate and present evidence he was

18   physically incapable of manual strangulation due to an arm injury.  The state court ruled:

19                . . . Lui fractured his right forearm playing rugby, four
      months before Boussiacos's murder. He had six screws placed in his
20    arm and wore a cast for several weeks. The cast was removed in
      mid-November over two months before Boussiacos's murder.

21
                Before trial, the State requested Lui's medical records in
22    anticipation of a possible medical defense. Savage acknowledged
      that Lui had an arm injury and that medical records corroborated it
23    but informed the State that he would not be raising a medical.
      defense. In his posttrial declaration, Savage explains that he did not

REPORT AND RECOMMENDATION - 50

present this evidence because he believed a medical defense was "tenuous, at best," given Lui's stature and athletic prowess, testimony from one witness that Lui was physically able to move a heavy dresser by himself despite the injury, and Lui's statement to the police that he had changed Boussiacos's flat car tire by himself the night before she disappeared.  State's Resp. to Pers. Restraint Pet., App. C at 8-9.

Lui dismisses Savage's reservations as easily rebuttable by medical records. According to Lui, those records show that he was wearing a cast until mid-November and was still going to physical therapy in March 2001 – a month after Boussiacos's disappearance. Lui's posttrial medical expert opines that based on Lui's physical therapy records, Lui could not have moved a dresser by himself in November or December 2000, as one witness testified, since muscle atrophy would have been at its worst-during those initial weeks after his cast was removed. App. to Pers. Restraint Pet. at 201-02 (Becker Decl.).

While evidence that Lui had a weak right arm raises doubt about whether he could have manually strangled Boussiacos with that arm, it does not cast doubt on the State's theory that Lui strangled her with a ligature. The State's medical examiner identified "band" marks with "a linear quality" along one side of Boussiacos's neck that was consistent with strangulation by a cord or other ligature. 10 RP at 1386-90. The medical examiner also found finger marks on that same side of Boussiacos's neck that could have belonged to either her or her assailant. 10 RP at 1387-90. As a result, the medical examiner could not specify whether Boussiacos died by manual strangulation or strangulation with a ligature. *Id*. The State did, however, find Boussiacos's DNA under her nails, which supported the theory that a ligature was probably used and that Boussiacos tried to pry it loose during the struggle.  9 RP at 1218-19.

Lui presents no evidence showing that he was incapable of strangling someone with a ligature. Lui's post-trial medical expert merely postulates that Boussiacos probably died of manual strangulation given the position of the fingermarks on her neck. His expert provides no explanation for the linear band marks; nor does he opine that Lui was incapable of strangling Boussiacos with a ligature. Thus, regardless of whether it was unreasonable for counsel to not present evidence of Lui's arm injury, Lui has failed to show a reasonable probability that this evidence would have altered the outcome of his case where the medical examiner concluded Boussiacos was strangled either manually or with a ligature.

REPORT AND RECOMMENDATION - 51

1    (Dkt. 9, Ex. 39 at 30-32.)

2        Petitioner does not show a failure to investigate.  Counsel was aware of petitioner's arm

3    injury.  His decision-making entailed consideration of prosecution witnesses who would attest to

4    petitioner's physical abilities shortly before and on the night of Boussiacos's murder, the evidence

5    of his athletic process as an avid rugby player and fitness buff, and his general strength and size.

6    Counsel concluded introduction of the arm injury "could hurt rather than help by diminishing the

7    defense case[,]" and the evidence ligature strangulation could not be ruled out, "which requires far

8    less strength and dexterity than manual strangulation."  (*Id*., Ex. 26, App. C at 4.)

9        Petitioner also fails to undercut the state court's conclusion he could not show prejudice.

10   Contrary to petitioner's contention, the state court did not require he show he was incapable of

11   strangling someone with a ligature and therefore apply a higher prejudice standard than required

12   by *Strickland*.  The state court considered evidence from the medical expert supporting the theory

13   of ligature strangulation, including the evidence of band marks, finger marks, and DNA under

14   Boussiacos's nails.  The court also considered deficiencies in the countervailing opinion evidence,

15   which not only failed to include evidence petitioner was incapable of ligature strangulation, but

16   also reflected mere postulation as to manual strangulation and no explanation for the linear band

17   marks.  (*See* Dkt. 9, Ex. 39 at 31-32 and Ex. 25, App. 15.)  The state court properly applied

18   *Strickland* in finding no reasonable probability that, but for counsel's alleged errors, the result of

19   the proceeding would have been different.

20        e.    Other suspect evidence (Ground 8):

21        Petitioner takes issue with counsel's failure to investigate and present "other suspect"

22   evidence about James Negron, Boussiacos's ex-husband.  The Washington Supreme Court held:

23            Lui's defense theory at trial was that someone else killed
             Boussiacos. Lui asserts his trial counsel was deficient for not

REPORT AND RECOMMENDATION - 52

offering Boussiacos's ex-husband, Negron, as a possible suspect. DNA matching Negron's paternal b1oodline was found on Boussiacos's shoelaces, and Negron knew Boussiacos would be heading to the airport the Saturday morning that she disappeared. Negron also had a hot temper and possible motive for killing Boussiacos because the two were involved in a custody and child support dispute over their son. Lui contends that dispute was especially significant because custody and child support matters had been extremely hostile between Negron and Boussiacos in the past, resulting in Negron absconding with their son, moving to Washington, and forging Boussiacos's signature on dissolution and custody papers in 1994 and 1995. When questioned by the detectives, Negron confirmed that Boussiacos had mentioned that she wanted to change their parenting plan and child support arrangement but explained they were still in the informal discussion phase.

Prior to trial, the State moved to exclude evidence of Negron's alleged gang affiliation, evidence that he physically abused his son, and testimony from Boussiacos's former roommate about Negron's credibility. Savage conceded that such evidence was not relevant and informed the State that he did not intend to offer Negron as an alternative suspect. Lui contends there was no strategic or tactical purpose for this concession. In a posttrial declaration, Savage explains he did not offer Negron as an alternative suspect because he did not believe it was legally colorable under state law and because Negron was a church pastor, had an alibi corroborated by three people, and was not fighting with Boussiacos over custody of their son. Savage dismissed the presence of DNA matching Negron's bloodline on Boussiacos's shoelaces as probably belonging to Negron's son who shared the same paternal DNA profile as him and over whom Boussiacos shared custody.

"The standard for relevance of other suspect evidence is whether there is evidence 'tending to connect' someone other than the defendant with the crime" beyond mere speculation. *State v, Franklin*, 180 Wn.2d 371, 381, 325 P.3d 159 (2014) (internal quotation marks omitted) (quoting *State v. Downs*, 168 Wash. 664, 667, 13 P.2d 1 (1932)). While motive alone may not be enough, *id*. at 379-80, Lui had more than motive. He had DNA evidence matching Negron's paternal bloodline on Boussiacos's shoelaces, which, according to the State's theory, had been tied by Boussiacos's assailant.

The decision to forgo otherwise permissible evidence does not, however, render counsel ineffective if the decision can be

REPORT AND RECOMMENDATION - 53

characterized as part of legitimate trial strategy. Here, counsel weighed the debatable importance of Negron's DNA on Boussiacos's shoelaces against the strength of his alibi, his reputation in the community as a church pastor, and the absence of any recent altercation between Negron and Boussiacos and decided not to pursue Negron as a possible other suspect. Savage explains his trial strategy was to highlight deficiencies in the State's case rather than engage in a contest between theories for fear that it would reflect poorly on the defense in the event the jury disagreed with the defense theory that Negron was the true assailant. State's Resp. to Pers. Restraint Pet., App. C at 2-3.

The touchstone for ineffective assistance is not whether we agree with counsel's approach. "Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. In light of the unidentified DNA evidence found on Boussiacos's gearshift skirt, the unidentified fingerprints lifted from her car, the unidentified male DNA on her shoelaces, and the unidentified semen found in Boussiacos's vagina, it was not unreasonable for counsel to focus on that unidentified suspect or suspects rather than specifically target Negron, especially when Negron had an alibi, albeit not as strong as Savage believed,[(Although Savage noted that Negron had three alibi witnesses for Friday night, the record slows that his wife was the only person who could corroborate his whereabouts that Saturday morning.)] and did not know where Boussiacos lived. App. to Pers. Restraint Pet. at 24 (explaining how Boussiacos kept her residential address a secret from Negron). Lui fails to overcome *Strickland's* strong presumption of reasonableness.

(Dkt. 9, Ex. 39 at 26-29 (one footnote omitted).)

Petitioner contends counsel's failure to investigate or present evidence supporting the suspicion regarding Negron undermined his defense that someone else committed the murder. He asserts the state court merely adopted counsel's false representations regarding this issue and unreasonably excused counsel's acts and omissions as justifiable trial tactics. Pointing to testimony that petitioner had named Negron as a possible suspect during the investigation and that Negron had an alibi, petitioner argues his counsel was left unable to refute the resulting impression he "was molding outlandish accusations against Negron to deflect blame from himself." (Dkt. 1

REPORT AND RECOMMENDATION - 54

at 30-31.)  He argues the decision is contrary to *Strickland* in failing to recognize a decision made without conducting an investigation is neither competent, nor tactical, as well as unreasonable in reciting facts, without an evidentiary hearing, that are either contested or false.

Again, however, petitioner fails to demonstrate ineffective assistance or that the record was not sufficient to resolve this claim.  The record does not support petitioner's contention of a failure to investigate.  The record reflects counsel rejected the idea of focusing on Negron as the other suspect with consideration of case law and evidence that could have diminished that defense, such as Negron's status as a church pastor, his alibi, issues with motive, and DNA that could have been attributed to Negron's son.  (*See* Dkt. 9, Ex. 26, App. C at 5-6.)  It reflects counsel's overarching strategy of highlighting deficiencies in the prosecution, rather than adopting a position that could be rejected by the jury.  (*Id*. at 2-3.)  Also, by not focusing solely on Negron, counsel was able to open the door to the possibility of other possible suspects given the unidentified DNA, fingerprint, and semen evidence, as well as the fact another murder of a female victim had occurred in the area only a few weeks prior to Boussiacos's disappearance.  (*See id*. at 5, 29.)  As found by the state court, while another strategy could have been pursued, the strategy adopted by counsel was not objectively unreasonable.

### f.  Impeachment of detective (Ground 10):

Petitioner's final allegation of ineffective assistance challenges counsel's failure to impeach a detective with his lengthy disciplinary history.  The Washington Supreme Court held:

> . . . Prior to trial, the State moved to exclude Gulla's disciplinary history as detailed in a 2005 *Seattle Post-Intelligencer* article. The article revealed Gulla had been under internal investigation numerous times for making sexual advances toward a minor in 1986, for tampering with a breathalyzer test in exchange for a date with a young woman in 1986, for striking and cursing at a hit-and-run suspect in 1988, for videotaping gang members assaulting other gang members rather than intervening to stop the

assault in 1992, and for using his authority as an officer to intimidate and threaten his girlfriend's estranged husband in 2004.

Savage agreed not to introduce evidence of Gulla's disciplinary history at Lui's 2008 trial unless the State opened the door. He explained that he did not intend to present the evidence because the allegations made against Gulla in the article and in other unidentified cases had no nexus to Lui's case. Counsel's assessment was not unreasonable.

ER 608 permits impeachment of a witness through his or her character for truthfulness and untruthfulness. Although ER 608(b) allows impeachment through specific instances of misconduct, such conduct must be probative. Because the probative value of misconduct diminishes over time, ER 609(b) places a presumptive 10-year time limit on prior convictions. As indicated above, many of Gulla's infractions cited in the *Seattle Post-Intelligencer* article were over 10 years old by the time Lui went to trial in 2008.[] It was therefore not unreasonable for counsel to have conceded their exclusion. It was also not unreasonable for counsel to forgo impeaching Gulla with testimony he gave in 2001 in a different case since the court in that case could not determine whether Gulla's testimony was "intentionally misleading or just carelessly inaccurate." App. to Pers. Restraint Pet. at 451, 468.

Furthermore, even if evidence of Gulla's prior misdeeds were relevant and not too remote in time, Lui still fails to show how impeaching Gulla about his past transgressions would have altered the results in this case. "The need for cross-examination on misconduct diminishes with the significance of the witness in the state's case." *State v. Clark*, 143 Wn.2d 731, 766, 24 P.3d 1006 (2001). Contrary to Lui's contention, Gulla was not a decisive witness for the State. As previously discussed, the linchpin of the State's case was the way Boussiacos was dressed and how her travel bag was packed when the officers found her. Although Gulla was at the crime scene when Boussiacos's body was found, he was not alone and his testimony was corroborated by other officers who were present at the crime scene and the many photographs they took there.

The only evidence to which Gulla testified independently was the preservation of DNA evidence at the precinct and the seizure of clothing from Lui's home that was used as scent samples for tracking purposes. That testimony was not particularly helpful to the State's case. The strength of the DNA evidence was debatable since there were multiple male DNA sources on Boussiacos's shoelaces

REPORT AND RECOMMENDATION - 56

and vaginal wash. Even worse for the State, forensic testing of the bloodstain on Boussiacos's gearshift skirt and fingerprint analysis of the prints lifted from her car excluded Lui as a possible source for both. As for the scent track evidence, it was highly disputed at trial, with the State's expert even admitting that an 11-day-old scent fell within the outer limits for a reliable scent track.

(Dkt. 9, Ex. 39 at 23-26 (footnote omitted).)

In his post-trial declaration, counsel explained he did not believe the evidence regarding Gulla was admissible and that, even if admissible, it was remote, peripheral, and unrelated. However, he informed the prosecution any attempt to portray Gulla as particularly experienced or capable would open the door to Gulla's history and believed the State kept Gulla's testimony tightly constrained to avoid impeachment. (*Id.*, Ex. 26, App. C at 4-5; *see also* Dkt. 13-1 at 60-67 ("[Prosecutor]: My understanding . . . i[s] he does not plan to go into [Gulla's disciplinary history], unless a door is opened[.] . . . [Counsel]: I don't see any nexus between the alleged misconduct of Detective Gulla and other cases and this case. But the Court has been through this. The State produces the detective, and all of a sudden we go into all of these classes, and these expert cleaning, and 'I have done this and I have done that.' If I think that the door is opened, I will advise the Court and we can take it up in the absence of the jury before I get into it."))

Petitioner argues the state court unreasonably decided this issue without an evidentiary hearing. He maintains some of Gulla's misconduct would have been admissible under state law to show motive and common scheme or plan. He denies Gulla was a peripheral witness, noting his testimony as to petitioner's clean house and garbage can, suggesting petitioner seemed to be faking concern for Boussiacos, that there were leaves and pine needles in petitioner's driveway, but no debris on Boussiacos's shoes, and his role in collecting the scent sample. Petitioner argues competent counsel would have impeached Gulla and counsel's failure to do so allowed for the

presumption Gulla was honest and reliable.

The court finds neither the absence of an evidentiary hearing, nor the state court's adjudication of this claim unreasonable. Counsel's conclusion the disciplinary evidence lacked an obvious nexus to this case and was remote in time was not objectively unreasonable. *See, e.g., Gentry v. Sinclair*, 705 F.3d 884, 905-06 (9th Cir. 2013) (while information a detective had been fired from a previous job for misconduct and had lied to obtain search warrants in other cases was favorable to the petitioner as it could have been used to impeach the detective's credibility for truthfulness, it was "[t]angential at best, and contained mostly in newspaper articles," and "even if used to impeach Detective Wright at trial, would not have created a reasonable probability of a different result[.]") Petitioner's assertion as to admissibility is conclusory and his arguments fail to account for the fact counsel affirmatively acted to ensure the limited nature of Gulla's testimony prior to trial. He also fails to address the state court's consideration of the fact Gulla testified independently only in two discrete areas. Both here, and in relation to all of the claims of ineffective assistance, petitioner fails to establish the state court's adjudication was contrary to or an unreasonable application of clearly established federal law.

3.   <u>Prosecutorial Misconduct (Ground 6)</u>:

Petitioner avers prosecutorial misconduct through the above-described improper statements of the prosecutor during closing argument. In analyzing a claim of prosecutorial misconduct, the appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). *See also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Improper argument does not, per

REPORT AND RECOMMENDATION - 58

1    se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir.

2    1993). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally

3    condemned.'" *Darden*, 477 U.S. at 181 (quoted source omitted). The question is whether it can

4    be said the "prosecutors' comments 'so infected the trial with unfairness as to make the resulting

5    conviction a denial of due process.'" *Id.* (quoting *Donnelly*, 416 U.S. at 643). The Court must

6    examine the entire proceedings and place the prosecutor's statements in context. *See Greer v.*

7    *Miller*, 483 U.S. 756, 765-66 (1987).

8         In addition to the reasoning outlined above, the Washington Supreme Court explained its

9    decision for rejecting petitioner's separate due process claim based on prosecutorial misconduct:

10              Because Lui failed to object at trial, the claim is waived unless he
11              can show that the misconduct was "so flagrant and ill-intentioned
                that it evinces an enduring and resulting prejudice" and was
12              incurable by a jury instruction. *Stenson*, 132 Wn.2d at 719. Even if
                the prosecutor's discussion of the "innocent man" were sufficiently
13              flagrant and ill intentioned, we do not find the prosecutor's singular
                reference to the behaviors of an innocent man, when considered in
14              context with the State's entire closing argument, produced pervasive
                prejudice in the minds of the jury and was incapable of being
15              remedied by a curative instruction.

16    (Dkt. 9, Ex. 39 at 42-43.)

17         Petitioner argues the state court unreasonably diminished the impact of the improper

18    remarks and unreasonably found an absence of prejudice by considering the remarks in isolation,

19    rather than the cumulative prejudice from both the failure to object and the improper argument.

20    However, while devoting a separate paragraph to prosecutorial misconduct, the state court

21    considered this claim in conjunction with the related ineffective assistance claim. (*See id.* at 36-

22    43 (addressing "Comments on Lui's Guilt or Innocence" as a whole).) The state court also

23    reasonably found the improper comments, viewed in the context of the extensive closing argument,

REPORT AND RECOMMENDATION - 59

1   no more than isolated incidents not resulting in actual prejudice.  *See, e.g., Cunningham*, 704 F.3d

2   at 1159; *Hall*, 935 F.2d at 165-66.  Petitioner does not establish a due process violation.

3       4.    <u>Jury Misconduct (Ground 9)</u>:

4   Petitioner alleged jury misconduct.   The Washington Supreme Court described and

5   disposed of that claim as set forth below:

> Next, Lui contends that he is entitled to a new trial because
> a juror mentioned to another juror during jury deliberations that she
> thought Taumoefolau, whom she referred to by his nickname Sam,
> said he and Lui were posting flyers at the shopping mall near the
> WAC and that she knew that testimony could not be true because
> the shopping mall was not built until after the murder occurred.
>
> Central to our jury system is the secrecy of jury
> deliberations. *See Long v. Brusco Tug & Barge, Inc.*, 185 Wn.2d
> 127, 131, 368 P.3d 478 (2016). This does not mean that jury
> discussions are immune from judicial review. Jurors can engage in
> reversible misconduct when they inject extrinsic evidence into jury
> deliberations because in doing so, they strip a defendant of the
> opportunity to object, cross-examine, explain, or otherwise rebut
> that evidence. *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197,
> 199 n.3, 75 P.3d 944 (2003). To balance these competing rights,
> courts will not consider allegations of jury misconduct that inhere in
> the verdict. *Long*, 185 Wn. 2d at 131-32. Matters that inhere in the
> verdict include "facts 'linked to the juror's motive, intent, or belief,
> or describ[ing] their effect upon' the jury" or facts that cannot be
> rebutted by other testimony without probing any juror's mental
> processes. *Id*. (alteration in original) (quoting *Gardner v. Malone*,
> 60 Wn.2d 836, 841, 376 P.2d 651 (1962)). "Only if a court
> concludes that juror declarations allege actual facts constituting
> misconduct, rather than matters inhering in the verdict, does it
> proceed to 'decide the effect the proved misconduct could have had
> upon the jury.'" *Id*. at 132 (quoting *Gardner*, 60 Wn.2d at 841).
>
> Our inquiry therefore begins with deciding whether Lui
> alleges juror misconduct that inheres in the verdict. *Id*. at 131. Lui
> submits the following declaration from his private investigator:
>
> > On or about June 16, 2008, I received a telephone call
> > from one of the jurors, Clare Comins, in response to
> > my telephone message. Mr. Comins informed me
> > that during deliberations there was *discussion*

REPORT AND RECOMMENDATION - 60

> *concerning the credibility of one of Mr. Lui's defense witnesses*, a man named Sam. Comins recalled Sam testifying that both he and Mr. Lui had distributed missing person's leaflets at a particular mall. The mall was outside the area of the aerial photographs that had been introduced as exhibits in the case, but Sam described the location. During deliberations, one of the female jurors explained that she had lived in Woodinville at the time of the murder and she knew that the mall described by Sam could not possibly have been leafleted in the days following Ms. Boussiacos's disappearance because the mall had not yet been built. *The other jurors discussed how Sam's misstatement concerning the existence of the mall reflected poorly on his overall testimony.*

> App. to Pers. Restraint Pet. at 65-66 (Decl. of Denise Scaffidi) (emphasis added). Jury discussions about Taumoefolau's credibility and the date the mall was constructed are matters that inhere in the verdict. *See Cox v. Charles Wright Academy, Inc.*, 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967). As the emphasized text above illustrates, the challenged discussion touched on the mental processes by which individual jurors arrived at the verdict, the effect Taumoefolau's testimony had on the jury, and the weight particular jurors may have given Taumoefolau's testimony.[]

(Dkt. 9, Ex. 39 at 49-51 (footnote omitted).)  Because it found the challenge inhered in the verdict, the state court declined to consider petitioner's request for a reference hearing.  (*Id*. at 51, n.15.)

A criminal defendant is entitled to a jury that reaches a verdict on the basis of the evidence produced at trial.  *Turner v. Louisiana*, 379 U.S. 466, 471-73 (1965).  "Evidence not presented at trial . . . is deemed 'extrinsic.'"  *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (cited and quoted sources omitted).  A jury's exposure to extrinsic evidence deprives a defendant of the Sixth Amendment rights to confrontation, cross-examination, and the assistance of counsel. *Raley v. List*, 470 F.3d 792, 803 (9th Cir. 2006).

However, courts distinguish between situations entailing internal, rather than external or extraneous influence.  *Tanner v. United States*, 483 U.S. 107, 117-21 (1987).  Factors such as

REPORT AND RECOMMENDATION - 61

physical or mental incapacity, substance abuse, and dishonesty during voir dire amount to internal influences on a verdict, while "'extraneous influence' would include 'something which did not essentially inhere in the verdict, - an overt act, open to the knowledge of all the jury, and not alone within the personal consciousness of one.'" *Tarango v. McDaniel*, 837 F.3d 936, 946 (9th Cir. 2016) (citing *Tanner*, 483 U.S. at 118-25, and *Warger v. Shauers*, 574 U.S. 40, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422 (2014), and quoting *Mattox v. United States*, 146 U.S. 140, 149 (1892)). "[C]ourts universally prohibit jurors from impeaching their own verdicts through evidence of their internal deliberative process." *Id.* at 947 (citing *Tanner*, 483 U.S. at 117-20).

The mere fact a juror brings past personal experience to bear on the case does not reflect the existence of external or extraneous influence implicating a constitutional right. *Grotemeyer v. Hickman*, 393 F.3d 871, 878-79 (9th Cir. 2004). That is, while a juror may not introduce "evidence developed outside the witness stand such as the results of a juror's experiment conducted while the jury was on a weekend recess, or legal research performed during the trial in an attempt to supplement inadequate instructions from the judge[,]" introduction of some aspect of the juror's personal life experience may be permissible. *Id.* A defendant is entitled "to an 'impartial' jury, not to an ignorant one." *Id.* at 879. In this case, the state court reasonably applied clearly established federal law in finding the juror information inhered in and could not be used to impeach the verdict. *See, e.g.*, *id.* at 878-79 (finding no Supreme Court authority holding a jury foreman's reference to her experience as a medical doctor, opinion defendant's mental disorders caused him to commit the crime, and that he would receive treatment as part of a sentence amounted to a constitutional violation); *Raley*, 470 F.3d at 803 ("Although the jury's discussion of [the defendant's failure to testify] clearly violated the trial court's instructions, what happened (or did not happen) in the courtroom was a part of the trial, not extrinsic to it. We may not inquire into a

jury's deliberations concerning the evidence at trial.")

Petitioner argues the state court should have held a hearing on this issue, noting "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). However, Supreme Court case law does not require a hearing any time evidence of juror bias is raised. *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (citing *Smith*, 455 U.S. 209, and *Remmer v. United States*, 347 U.S. 227 (1954)); *accord Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003) ("'Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source.'") (quoted source omitted). In this case, upon finding no issue of external influence, the state court properly declined to hold an evidentiary hearing. *See Grotemeyer*, 393 F.3d at 880-81.

Petitioner further fails to support his request for an evidentiary hearing in this court. While providing for exceptions for improper extraneous prejudicial information, outside influence on a juror, or a mistake in entering the verdict on the verdict form, Federal Rule of Evidence 606(b) bars juror testimony, affidavit, or evidence "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Information is "'extraneous' if it derives from a source 'external' to the jury." *Warger*, 135 S. Ct. at 529 (citing *Tanner*, 483 U.S. at 117-19). "'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id*. (citations omitted).

As argued by respondent, petitioner's claim relies on evidence inadmissible under Rule 606(b). Therefore, even if the Court were to hold an evidentiary hearing, petitioner would be

unable to explore the juror's statement regarding her personal knowledge as to the existence of the

mall and what effect that disclosure may have had on the jury. *See Neng Saypao Pha v. Swarthout*,

No. 15-16028, 2016 U.S. App. LEXIS 13919 at *4-5 (9th Cir. Aug. 9, 2016).

5.    Cumulative Error (Ground 11):

Petitioner alleges cumulative error merits a new trial. "[T]he combined effect of multiple

trial court errors violates due process where it renders the resulting criminal trial fundamentally

unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410

U.S. at 298, 302-03 (1973)). Cumulative error can amount to a due process violation "even where

no single error rises to the level of a constitutional violation or would independently warrant

reversal." *Id.* (citing *Chambers*, 410 U.S. at 290 n.3).

The state court found petitioner failed to meet his burden of demonstrating accumulated

prejudice from multiple trial errors resulted in substantial prejudice denying him a fair trial. (Dkt.

9, Ex. 39 at 45-46). The court reasoned:

> Even if we assume Savage was sleeping at some point during trial
> or that it was unreasonable for him to not present evidence of Lui's
> arm injury to the jury (issues we do not decide), Lui fails to show
> how these errors, when combined with the prosecutor's singular
> comment about the expected reactions of an "innocent man,"
> resulted in substantial prejudice. The errors are completely
> unrelated, and any prejudice caused by them was extremely minor.

(*Id.*) Because petitioner does not show unreasonable adjudication of this claim or cumulative error

resulting in actual prejudice, he is not entitled to habeas relief.

CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA)

from a district or circuit judge. A COA may issue only where a petitioner has made "a substantial

REPORT AND RECOMMENDATION - 64

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, the Court concludes petitioner is not entitled to a COA.

CONCLUSION

The Court recommends the habeas petition be DENIED, and this case DISMISSED. An evidentiary hearing is not required as the record conclusively shows petitioner is not entitled to relief. A proposed Order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **June 28, 2019**.

DATED this 11th day of June, 2019.

_____
Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 65